Filed 11/20/14

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,                                )
                                           )
        Plaintiff and Respondent,          )
                                           )          S210898
        v.                                 )
                                           )      Ct.App. 4/1 D060317
VINCE BRYAN SMITH,                         )
                                           )        Riverside County
        Defendant and Appellant.           )     Super. Ct. No. BAF004719
_____    )

A person who aids and abets a crime is guilty of that crime, sometimes called the target crime. Additionally, that person is guilty of any other crime a principal in the target crime commits, sometimes called the nontarget crime, that is a natural and probable consequence of the target crime. In this case involving violent criminal street gangs, we must decide whether defendant was properly convicted of the murders of two of his fellow gang members even though he neither personally killed them nor desired their deaths. Because, under the peculiar circumstances of the case, a reasonable jury could find that a principal or principals in the target crimes committed the murders, and they were a reasonably foreseeable consequence when defendant aided and abetted the target crimes, we conclude that he was properly convicted of them. Accordingly, we affirm the judgment of the Court of Appeal, which reached a similar conclusion.

## I. FACTUAL AND PROCEDURAL HISTORY

This factual recitation is taken primarily from the Court of Appeal opinion authored by Justice Benke.

Three criminal street gangs played a role in this case: the Gateway Posse Crips (Gateway Posse), the YAH (short for Young Ass Hustlers) Squad, and the Pueblo Bishop Bloods (Pueblo Bishop). Pueblo Bishop members were known to carry guns and use them against rival gangs. The Gateway Posse and Pueblo Bishop were enemies, and there had been a history of violence between them.

Defendant Vince Bryan Smith was a member of Gateway Posse. Each of the two murder victims, defendant's friend, Vincent McCarthy, and his cousin, Demetrius Hunt, was either a member or an "associate" of the gang. Defendant's friend, Julian McKee, was a member of yet another gang, but one that was affiliated with Gateway Posse.

The YAH Squad began as an unaffiliated dance crew in 2002 and eventually transitioned into a criminal street gang whose members often carried guns. At the time of the killings, the YAH Squad had about 10 members. It had developed an affiliation with Pueblo Bishop because one of its members, Deshawn Littleton, was also affiliated with that gang. Members of the YAH Squad present at the killings included Littleton, Jermarr Session, Edward Scott, Aaron Lee, Lonnie Walton, and Jesus Hernandez. Defendant's younger brother, Robert McMorris, was a member of the YAH Squad, but he wanted to leave the gang.

In addition to Littleton, Pueblo Bishop members involved in this case included Tovey Moody (Tovey) and Wealton Moody (Wealton).

Before the killings, YAH Squad members were "upset" with McMorris (defendant's brother) because he was not adequately representing or participating in the gang. Gang members participate by earning money for or defending the gang and its territory. When a gang member is not participating, the member may

receive a "discipline," essentially a beating by fellow gang members. Because YAH Squad members planned to discipline McMorris, he wanted to quit being a member of the gang.

A few days before the killings, defendant, appearing "really mad," drove to a liquor store where YAH Squad members had congregated and asked Edward Scott, "When you all supposed to be putting hands on my little brother?" After defendant explained that his younger brother was McMorris, Scott told him that nobody was supposed to put hands on McMorris because he was "the little homie." Lonnie Walton, who witnessed this exchange, testified that defendant threatened to kill one of the group "over [his] brother" and, as defendant was leaving, it appeared he "threw" the hand sign for Gateway Posse.

There was testimony that Deshawn Littleton, who was also present at this exchange, and Scott were angry at defendant because he had "disrespected" the YAH Squad. As the group walked back to their apartments, Littleton pounded his fists and said that he was "going to beat the fuck out of [McMorris]." Littleton also mentioned he was going to call Tovey, a member of Pueblo Bishop, about the incident.

Walton testified that a few days before the killings, while YAH Squad members were hanging out in a parking lot, Tovey arrived, spoke with Scott and Littleton, and gave Littleton "something." Scott, Littleton, and Tovey got into a truck and left. Walton testified he heard multiple gunshots a few minutes later.

Shortly thereafter, Wealton, Walton, and one or more YAH Squad members went to an apartment where defendant was present. Walton testified that when they arrived, Tovey and defendant were arguing about the liquor store incident. Demontre Carroll, 12 years old at the time of these events, testified that

3

he was visiting a friend at the apartments when he heard the confrontation between Tovey and defendant.[1]  He heard Tovey tell defendant, "I heard you came at my little homie [Littleton] foul," meaning defendant had disrespected YAH Squad.  Defendant responded, "[W]ell, I didn't want my little brother in that shit."  Tovey told defendant he had no problem with defendant's demand.  According to Demontre, defendant threatened to "bring some of [his] homies to make sure none of this shit pops off," which Demontre took to mean that defendant was going to bring backup to ensure nothing went wrong when McMorris was "jumped out" of the YAH Squad.  Tovey then remarked to defendant, "I know you're not talking about gun play."  At that point, a neighbor got between defendant and Tovey and everyone left.

On February 7, 2006, the day of the killings, defendant told his brother he was taking him to get "jumped out" of the YAH Squad.  The Court of Appeal summarized the evidence about what this meant.  "To join a criminal street gang, potential members often have to be 'jumped in,' which typically involves three or four members of the gang beating the potential new member for a set period of time while the new member does his or her best to fight back.  Likewise, in order to get out of a gang, a member must be 'jumped out,' which typically involves a beating of that member by the same members who jumped him or her into the gang."

Littleton told YAH Squad members that they were going to fight Gateway Posse "homies."  Defendant picked up McMorris after school, then picked up McCarthy, Hunt, and McKee to make sure his brother did not get beaten too badly and things did not get out of hand.  McCarthy had a gun.  As they drove, they

---

[1]    Demontre was killed in October 2007 in an unrelated incident. Accordingly, his preliminary hearing testimony was read into the record at trial.

4

agreed they would shoot back only if shot at first.  McMorris told defendant that YAH Squad members Scott and Lee had jumped him into the gang.

When defendant, McMorris, McCarthy, Hunt, and McKee arrived, they approached a group of men that had gathered outside some apartments, including members of the YAH Squad and Pueblo Bishop.  Demontre observed Tovey give Littleton what appeared to be a gun.  He said that Tovey also possessed another gun.

Defendant pointed at Scott and Lee and said, "I want you guys to put my brother off."  Those present decided to do the "jump out" in a field next to the apartments.  The two groups remained separate as they headed to the field.  Just before the fight began, defendant said, "I don't want nobody kicking my brother in the head."  Walton testified that defendant's attempts to give orders to YAH Squad members did not sit well with them.

At some point, McMorris heard Littleton tell Scott and Lee, "You guys know what you guys got to do."  McMorris began to fight with Scott and Lee.  They got the better of him, and Lee hit McMorris, bloodying him and knocking him to the ground.  Defendant intervened, grabbed his brother, and pulled him up.

What happened next was the subject of much discussion at trial.

Walton testified that YAH Squad member Jesus Hernandez yelled at defendant, "Fuck that, JR [meaning defendant].  He [meaning McMorris] got put on by four people."  Walton testified this meant that because four people had jumped in McMorris, four people had to jump him out.  In response, defendant said, "Fuck you."  He walked over to Hernandez and took a swing at him.  According to Walton, another Pueblo Bishop member grabbed defendant and told him to calm down.  Walton heard a gunshot from behind, ducked, and then took off running.  As he ran he heard more gunshots.  He estimated he heard a total of seven or eight shots.

5

McMorris testified that as Hernandez came near the fight, defendant tried to stop Hernandez and swung at him. McMorris saw Littleton, who had been leaning on a brick wall nearby, pull out a gun and start shooting. He saw the flash from the muzzle. McMorris hopped a fence and began running. Walton and Session also started running.

Demontre testified that several YAH Squad members came at McMorris after McMorris approached the group. He said that all of them struck McMorris, who attempted to fight back. With McMorris on the ground, Demontre heard defendant say, "Fuck this shit." He saw defendant pull out a gun from his pants and point it at several people. Demontre saw Littleton and Tovey respond by each pulling out a gun. As he dropped to the grass, Demontre heard several gunshots. He ran away, observing others also fleeing the scene.

Julian McKee told investigators that he did not see who fired the shots, but that once the shooting started he saw defendant with a handgun. He said that defendant was not the shooter, and that the other group did the shooting.

Hunt died at the scene after being shot four times. McCarthy was shot twice and died later at the hospital. Police investigators recovered two guns, five expended nine-millimeter bullet casings, and two expended .40-caliber casings. The bullets recovered from Hunt's body were nine millimeter; the single bullet recovered from McCarthy's body had the "weight and appearance" of a nine-millimeter bullet.

The evidence did not make clear who fired the fatal shots. The prosecutor's theory at trial was that Littleton fired the fatal shots.

The prosecutor charged defendant and several others with various crimes arising out of these events, including the murders of McCarthy and Hunt. Although defendant had several codefendants at trial, only he is involved in this

6

appeal.  The prosecution's theory was that defendant was guilty of the murders as an aider and abettor of those who actually shot the victims.

A jury found defendant guilty of the second degree murders of McCarthy and Hunt and of one count of active participation in a criminal street gang.  (Pen. Code, §§ 187, subd. (a), 186.22, subd. (a).)  It found true an allegation that the murders were committed for the benefit of, at the direction of, or in association with a criminal street gang.  (Pen. Code, § 186.22, subd. (b)(1).)

The Court of Appeal modified the judgment in a manner not relevant here and, as modified, affirmed the judgment.  In so doing, it affirmed the murder convictions.  We granted defendant's petition for review limited to the question of whether he was properly convicted of murder under the natural and probable consequence theory of aiding and abetting.

## II. DISCUSSION

Defendant was charged with, and convicted of, McCarthy's and Hunt's murders not on the theory that he actually shot them, but on the theory that he aided and abetted the person or persons who did.

"Penal Code section 31, which governs aider and abettor liability, provides in relevant part, 'All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission . . . are principals in any crime so committed.'  An aider and abettor is one who acts 'with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.'  (*People v. Beeman* (1984) 35 Cal.3d 547, 560.)"  (*People v. Chiu* (2014) 59 Cal.4th 155, 161, fn. omitted.)  "[A] person who aids and abets the commission of a crime is a 'principal' in the crime, and thus shares the guilt of the actual perpetrator."  (*People v. Prettyman* (1996) 14 Cal.4th 248, 259 (*Prettyman*).)

7

An aider and abettor is guilty not only of the intended, or target, crime but also of any other crime a principal in the target crime actually commits (the nontarget crime) that is a natural and probable consequence of the target crime. (*People v. Chiu*, *supra*, 59 Cal.4th at p. 161; *Prettyman*, *supra*, 14 Cal.4th at p. 260.) "Thus, for example, if a person aids and abets only an intended assault, but a murder results, that person may be guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.)

A consequence that is *reasonably foreseeable* is a natural and probable consequence under this doctrine. "A nontarget offense is a ' "natural and probable consequence" ' of the target offense if, judged objectively, the additional offense was reasonably foreseeable. [(*People v. Medina* (2009) 46 Cal.4th 913, 920.)] The inquiry does not depend on whether the aider and abettor actually foresaw the nontarget offense. (*Ibid*.) Rather, liability ' "is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted." ' (*Ibid*.) Reasonable foreseeability 'is a factual issue to be resolved by the jury.' (*Id*. at p. 920.)" (*People v. Chiu*, *supra*, 59 Cal.4th at pp. 161-162.)

Even though the murder victims were defendant's cousin and a friend, and no doubt he never intended their deaths, he was convicted of their murders under this natural and probable consequence doctrine. The prosecution's theory was that, although defendant, a Gateway Posse member, and members of the rival Pueblo Bishop gang (including the actual gunmen) were normally enemies, they cooperated in staging the jump out and, in so doing, aided and abetted each other in committing the target crimes of disturbing the peace and assault or battery. The prosecutor argued that during the commission of the target crimes, a principal in

8

those crimes (a member of Pueblo Bishop) committed the murders, and the murders were the natural and probable consequence of the target crimes.

The trial court instructed the jury on this natural and probable consequence theory regarding both murder and the lesser included offense of voluntary manslaughter. It used the language of CALCRIM No. 402, as adapted to the case. The court informed the jury that "[u]nder some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occur during the commission of the first crime." Then it instructed: "Before you may decide whether the defendant is guilty of murder or the lesser offense of voluntary manslaughter, you must decide whether he or she is guilty of disturbing the peace or assault or battery. To prove the defendant is guilty of murder or the lesser offense of voluntary manslaughter, the People must prove that:

"One, the defendant is guilty of disturbing the peace or assault or battery;

"Two, during the commission of disturbing the peace or assault or battery, a coparticipant in that crime committed the crime of murder or the lesser offense of voluntary manslaughter;

"And three, under all the circumstances, a reasonable person in the defendant's position would have known that the commission of the murder or voluntary manslaughter was a natural and probable consequence of the commission of the disturbing the peace or assault or battery.

"A coparticipant in a crime is the perpetrator or anyone who aided and abetted the perpetrator. It does not include a victim or innocent bystander.

"A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. A consequence is not reasonably foreseeable if it is merely possible. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the

9

evidence.  If the murder or voluntary manslaughter was committed for a reason independent of the common plan to commit the disturbing the peace or assault or battery, then the commission of murder or voluntary manslaughter was not a natural and probable consequence of disturbing the peace or assault or battery.

"To decide whether the crime of murder or voluntary manslaughter was committed, please refer to the separate instructions that I will give you defining those crimes."

The court also instructed the jury on the elements of disturbing the peace, assault, battery, murder, and voluntary manslaughter, as well as aiding and abetting.

Defendant contends the natural and probable consequence doctrine was misapplied in this case.  He argues that not all principals in the target crime may be guilty of nontarget crimes, but only some.  Specifically, he argues that "the English common law, as incorporated in Penal Code section 31, would not extend accessory liability to the acts of a person who was not directly aided and abetted by the accessory."  We disagree.  The law provides no distinction between those principals who directly, and those who indirectly, aid and abet the perpetrator who commits the nontarget crime.  "The distinction between an accessory before the fact and a principal, and between principals in the first and second degree is abrogated; and all persons concerned in the commission of a crime, who by the operation of other provisions of this code are principals therein, shall hereafter be prosecuted, tried and punished as principals . . . ."  (Pen. Code, § 971.) Defendant's liability was based on his being a principal under Penal Code section 31.  Under Penal Code sections 31 and 971, "those persons who at common law would have been termed accessories before the fact and principals in the second degree as well as those who actually perpetrate the offense, are to be prosecuted, tried and punished as principals in California."  (*People v. Beeman*, *supra*, 35

10

Cal.3d at p. 554.) "The Legislature has determined those who aid and abet and those who actually perpetrate the offense are principals and equally culpable." (*People v. Davis* (1992) 8 Cal.App.4th 28, 45.)

The statutes and, accordingly, the natural and probable consequence doctrine, do not distinguish among principals on the basis of whether they directly or indirectly aided and abetted the target crime, or whether they directly or indirectly aided and abetted the perpetrator of the nontarget crime. An aider and abettor of the target crime is guilty of any crime that any principal in that target crime commits if it was a natural and probable, i.e., reasonably foreseeable, consequence of the target crime.

As noted, the trial court's instructions included this sentence adapted from CALCRIM No. 402: "If the murder or voluntary manslaughter was committed for a reason independent of the common plan to commit the disturbing the peace or assault or battery, then the commission of murder or voluntary manslaughter was not a natural and probable consequence of disturbing the peace or assault or battery."

This sentence, if correct, would mean that a nontarget offense, even if reasonably foreseeable, is not the natural and probable consequence of the target offense if the jury finds it was committed for a reason independent of the common plan to commit the target offense. The mere fact that this sentence is in CALCRIM does not make it legally correct. "[J]ury instructions, whether published or not, are not themselves the law, and are not authority to establish legal propositions or precedent." (*People v. Morales* (2001) 25 Cal.4th 34, 48, fn. 7.)

Wondering whether this sentence was correct and, if so, whether the evidence supported a finding that the murders were not committed for an independent reason, we solicited supplemental briefs from the parties on the

11

question of whether the sentence is correct. Both parties argue that the sentence does not correctly state the law. We agree. To establish aiding and abetting liability under the natural and probable consequence doctrine, the prosecution must prove the nontarget offense was reasonably foreseeable; it need not *additionally* prove the nontarget offense was not committed for a reason independent of the common plan to commit the target offense.

It is not clear on what exactly the Advisory Committee on Criminal Jury Instructions of the Judicial Council based the sentence in question. The Commentary to CALCRIM No. 402 says, "Although no published case to date gives a clear definition of the terms 'natural' and 'probable,' . . . we have included a suggested definition." The cases cited in that commentary do not themselves support the sentence. It appears likely, however, that the sentence was based on language appearing in cases involving conspirator liability.

The leading early case concerning the liability of a conspirator for crimes committed by other conspirators stated that " 'where several parties conspire or combine together to commit any unlawful act, each is criminally responsible for the acts of his associates or confederates committed in furtherance of any prosecution of the common design for which they combine. . . . Each is responsible for everything done by his confederates, which follows incidentally in the execution of the common design as one of its probable and natural consequences, even though it was not intended as a part of the original design or common plan. Nevertheless the act must be the ordinary and probable effect of the wrongful act specifically agreed on, so that the connection between them may be reasonably apparent, *and not a fresh and independent product of the mind of one of the confederates outside of, or foreign to, the common design*.' " (*People v. Kauffman* (1907) 152 Cal. 331, 334, italics added (*Kauffman*).) The italicized

12

language is comparable to the sentence in CALCRIM No. 402 that we are considering.**2**

Subsequent cases have reiterated this concept in the context of conspirator liability. (E.g., *People v. Werner* (1940) 16 Cal.2d 216, 223 ["[T]he act must not be the fresh and independent product of the mind of one of the confederates outside of, or foreign to, the common design."]; *People v. Luparello* (1986) 187 Cal.App.3d 410, 444 [quoting *Werner*].)

We must decide whether this limitation on conspirator liability extends to aiding and abetting liability. Without specifically considering the question, language in some cases suggests it might. Some cases, for example, have cited concepts of conspiracy liability and concepts of aiding and abetting liability seemingly interchangeably. In *People v. Durham* (1969) 70 Cal.2d 171, this court noted "the two theories of conspiracy and aiding and abetting" the prosecutor had advanced to support the murder conviction and said that "[c]onspiracy principles are often properly utilized in cases wherein the crime of conspiracy is not charged in the indictment or information," sometimes "to show through the existence of conspiracy that a defendant who was not the direct perpetrator of the criminal offense charged aided and abetted in its commission." (*Id*. at pp. 179, 180, fn. 7.) It described the issue considered in *Kauffman*, *supra*, 152 Cal. 331, as "identical to that at bar" (*Durham*, at p. 182), and cited with approval *Kauffman*'s language

---

**2**        As can be noted, although Penal Code sections 31 and 971 use the word "principal" to designate a person concerned in the commission of a crime, some of the cases use descriptive words such as "participant" or "confederate." CALCRIM No. 402 refers to a "coparticipant," which it defines as including the "perpetrator or anyone who aided and abetted the perpetrator." In this context, we believe these terms are synonymous. The terms refer to any principal in the crime, whether a direct perpetrator or aider and abettor.

13

limiting the defendant's liability for an unintended crime. (*Durham*, at pp. 182-183; see *People v. Nguyen* (1993) 21 Cal.App.4th 518, 531.)

Our opinion in *Prettyman*, *supra*, 14 Cal.4th 248, is the closest we have come to considering this question. There, we discussed *Kauffman*, *supra*, 152 Cal. 331, and quoted its language stating that the conspirator is liable for an act of a confederate " ' "*which follows incidentally in the execution of the common design as one of its probable and natural consequences*," ' " and its language stating that the act must not be " ' "a fresh and independent product of one of the confederates outside of, or foreign to, the common design." ' " (*Prettyman*, at pp. 260-261, quoting *Kauffman*, at p. 334, italics added in *Prettyman*.) We then said that "*People v. Kauffman*, *supra*, 152 Cal. 331, involved the liability of conspirators for substantive crimes in the course of a conspiracy, not the liability of aiders and abettors, as does this case. But later decisions have applied the 'natural and probable consequences' doctrine to aiders and abettors [citations] as well as to conspirators [citations]." (*Prettyman*, at p. 261.)

Thus, *Prettyman* makes clear that an aider and abettor, like a conspirator, is liable for unintended crimes. But does the *limitation* on conspirator liability for crimes outside of or foreign to the common design also apply equally to an aider and abettor? In other words, for an aider and abettor, is it sufficient if the prosecution proves the nontarget crime was a reasonably foreseeable consequence of the target crime, or must the prosecution *additionally* prove that the nontarget crime was not committed for a reason independent of the common plan? In a case that predated *Prettyman*, the Court of Appeal considered this question and concluded that this limitation on conspirator liability does not apply to an aider and abettor. (*People v. Brigham* (1989) 216 Cal.App.3d 1039; see *People v. Anderson* (1991) 233 Cal.App.3d 1646 [following *Brigham*].)

14

We agree. Although conspiracy and aiding and abetting are similar in that both involve persons who engage in criminal conduct with someone else — thus making them sometimes liable for crimes that someone else commits — they are different in other ways. Conspiracy is an inchoate crime. "A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance of the conspiracy." (*People v. Morante* (1999) 20 Cal.4th 403, 416, quoting Pen. Code, § 184.) "Criminal conspiracy is an offense distinct from the actual commission of a criminal offense that is the object of the conspiracy." (*Morante*, at p. 416.) Other than the agreement, the only act required is an overt act by *any* of the conspirators, not necessarily the defendant, and that overt act need not itself be criminal. (*People v. Russo* (2001) 25 Cal.4th 1124, 1135.) Conspiracy thus criminalizes preparatory conduct at an earlier stage than an attempt to commit a crime. " ' "As an inchoate crime, conspiracy fixes the point of legal intervention at [the time of] agreement to commit a crime," and "thus reaches further back into preparatory conduct than attempt . . . ." ' " (*Morante*, at p. 417.)

Because a conspirator can be liable for a crime committed by any other conspirator, and the defendant need not *do* (or even encourage) anything criminal except agree to commit a crime, it is reasonable to make a conspirator not liable for another conspirator's crime that is " 'a fresh and independent product of the mind of one of the confederates outside of, or foreign to, the common design.' " (*Kauffman*, *supra*, 152 Cal. at p. 334.) But aiding and abetting is different. An aider and abettor is someone who, with the necessary mental state, "by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman*, *supra*, 35 Cal.3d at p. 561.) Because the aider and abettor is

15

furthering the commission, or at least attempted commission, of an actual crime, it is not necessary to add a limitation on the aider and abettor's liability for crimes other principals commit beyond the requirement that they be a natural and probable, i.e., reasonably foreseeable, consequence of the crime aided and abetted. If the prosecution can prove the nontarget crime was a reasonably foreseeable consequence of the crime the defendant intentionally aided and abetted, it should not additionally have to prove the negative fact that the nontarget crime was not committed for a reason independent of the common plan.

To be sure, whether an unintended crime was the independent product of the perpetrator's mind outside of, or foreign to, the common design may, if shown by the evidence, become *relevant* to the question whether that crime was a natural and probable consequence of the target crime. In a given case, a criminal defendant may argue to the jury that the nontarget crime was the perpetrator's independent idea unrelated to the common plan, and thus was *not* reasonably foreseeable and *not* a natural and probable consequence of the target crime. But that would be a factual issue for the jury to resolve (*People v. Chiu*, *supra*, 59 Cal.4th at p. 162), not a separate legal requirement.

Accordingly, the sentence at issue in CALCRIM No. 402 does not correctly state the law of aider and abettor liability. However, because the sentence was unduly favorable to defendant, giving it cannot have harmed him.

Next, we must decide whether substantial evidence supports defendant's murder convictions under the natural and probable consequence doctrine. "To determine whether sufficient evidence supports a jury verdict, a reviewing court reviews the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable jury could find the defendant guilty beyond a reasonable doubt." (*People v. Rountree* (2013) 56 Cal.4th 823, 852-853.)

16

Defendant contends the evidence was insufficient because the jury could not determine for sure who committed the two murders. The prosecution theory was that Littleton was the killer. But exactly who shot and killed the two victims was not entirely clear. There was evidence that both Littleton and Tovey possessed guns and fired shots. It was not certain which gun Littleton used and which gun Tovey used. But any such uncertainty did not matter as long as the jury unanimously agreed, as to each killing, that, whoever the actual gunman was, that gunman both committed murder, i.e., killed a human being with malice (Pen. Code, § 187), and was a principal in the target crimes. If the jury made those findings and also found that defendant aided and abetted the commission of the target crimes, and the murders were a natural and probable consequence of the target crimes, it could convict defendant of the murders despite uncertainty as to who exactly the killer was.

" '[A]s long as each juror is convinced beyond a reasonable doubt that defendant is guilty of murder as that offense is defined by statute, it need not decide unanimously by which theory he is guilty. [Citations.] More specifically, the jury need not decide unanimously whether defendant was guilty as the aider and abettor or as the direct perpetrator. . . . [¶] . . . [¶] Not only is there no unanimity requirement as to the theory of guilt, the individual jurors themselves need not choose among the theories, so long as each is convinced of guilt. Sometimes . . . the jury simply cannot decide beyond a reasonable doubt exactly who did what. There may be a reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he was the aider and abettor, but no such doubt that he was one or the other.' (*People v. Santamaria* (1994) 8 Cal.4th 903, 918-919; see also *People v. Beardslee* (1991) 53 Cal.3d 68, 92.) Defendant contends that different facts would support aiding and abetting liability and liability as a direct perpetrator, but, as we have explained, the jury need not

17

unanimously agree 'on the precise factual details of how a killing under one or the other theory occurred in order to convict defendant of first degree murder.' (*People v. Pride* [(1992) 3 Cal.4th 195,] 250.) Naturally, in order to return a guilty verdict, the jury must agree unanimously that each element of the charged crime has been proved, but the factors that establish aiding and abetting liability are not included as elements of the crime of murder. (*People v. Prettyman* (1996) 14 Cal.4th 248, 271." (*People v. Jenkins* (2000) 22 Cal.4th 900, 1024-1025.)

"The jury must agree on a 'particular crime' [citation]; it would be unacceptable if some jurors believed the defendant guilty of one crime and others believed her guilty of another." (*People v. Russo*, *supra*, 25 Cal.4th at pp. 1134-1135.) In this case, this means that "the jury must unanimously agree on guilt of a specific murder" — McCarthy's murder in one count and Hunt's murder in another. (*Id*. at p. 1133.) But additional unanimity is not required. (*Id*. at pp. 1133-1135.) "Once the discrete event is identified, for example, the killing of a particular human being, the theory each individual juror uses to conclude the defendant is criminally responsible need not be the same and, indeed, may be contradictory." (*People v. Davis*, *supra*, 8 Cal.App.4th at p. 45.) It suffices if the jury unanimously agrees that the prosecution has proven beyond a reasonable doubt every element necessary to establish guilt of a discrete crime.

The concurring opinion asserts we are deciding the case based on a "novel theory." (Conc. opn., *post*, at p. 2.) On the contrary, we are merely applying settled law to the facts of this case. The author of the concurring opinion would have us reject defendant's claim on the ground that each juror found specifically that Littleton fired the shots that killed both victims. Although substantial evidence would support a verdict on that basis, we are not so sure that was the sole basis for the verdict given the uncertainty in the evidence and the trial court's instructions. The court instructed the jury that its "verdict" on each count had to

18

be unanimous, but it gave no other unanimity instruction. It is possible that one or more of the jurors were not entirely certain exactly who fired the fatal shots, but all were convinced beyond a reasonable doubt that, whoever he was, he acted with malice and thus committed murder.

As we have explained, that finding, if combined with the other findings beyond a reasonable doubt necessary to convict — that whoever committed the murder was a principal in the target crimes, that defendant aided and abetted the target crimes, and that the murders were a natural and probable consequence of the target crimes — would mean each juror was convinced beyond a reasonable doubt that defendant was guilty of murder. No additional unanimity is required. The jury certainly had to find that someone committed murder. But the "jury simply did not have to find" exactly who that person was. (*People v. Culuko* (2000) 78 Cal.App.4th 307, 323 [applying these principles in a case involving the natural and probable consequence doctrine].)

Applying these rules here, the jury could readily have found as to each murder charge that the actual killer, whether he was Littleton or Tovey Moody or some other member of Pueblo Bishop, committed a discrete murder, i.e., that he killed McCarthy as to one count and Hunt as to another, and that he acted with malice regarding each killing. The jury could also have reasonably found that all of the possible shooters were aiders and abettors, and therefore principals, in the target offenses. Each juror could reasonably reject the possibility that some stranger to the jump out happened to come by at that moment and fired the fatal shots. The evidence also fully supported a finding that defendant aided and abetted the target offenses. Accordingly, the jury could reasonably find defendant guilty of the nontarget murders if they were the natural and probable consequence of the target offenses.

19

Finally, the evidence supported the jury's finding that the murders were the natural and probable consequences of the target offenses of disturbing the peace and assault or battery. Members of Pueblo Bishop were known to carry guns and use them against rival gangs, including Gateway Posse. A few days before the jump out, defendant flashed a gang sign and threatened to kill members of the YAH Squad "over [his] brother." He also told YAH Squad and Pueblo Bishop members that he was going to bring some of his "homies" to ensure the jump out did not escalate. Defendant brought a gun to and helped establish the rules of the jump out. Rival Crips and Blood gang members both attended and participated in the jump out and were thus in close proximity to each other. Defendant did in fact bring fellow gang members to act as backup in case things got out of hand. There was also evidence that during the jump out itself, defendant pulled out his gun and pointed it at several people. Under these circumstances, a reasonable jury could find that the murders were a very foreseeable consequence of the jump out that defendant aided and abetted.

### III. CONCLUSION

We affirm the judgment of the Court of Appeal.

CHIN, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
BAXTER, J.
WERDEGAR, J.
CORRIGAN, J.
BAMATTRE-MANOUKIAN, J.*

_____

* Associate Justice of the Court of Appeal, Sixth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

20

**CONCURRING OPINION BY LIU, J.**

At trial, both the prosecution and the defense proceeded on the theory that Deshawn Littleton shot and killed the two victims in this case, Demetrius Hunt and Vincent McCarthy. The evidence showed that Littleton went to the jumpout with a gun. When fighting broke out among the gang members, Littleton pulled out his weapon and fired several shots. One witness testified that the shots came from where Littleton, and only Littleton, was standing. Further, the record shows that Hunt and McCarthy were killed with the same kind of bullet (maj. opn., *ante*, at p. 6), making it reasonable to infer that they were killed by the same gun. During her closing argument, the prosecutor acknowledged that several individuals fired weapons, but she said, "of course, the suggestion is" that Littleton killed Hunt and McCarthy. She went on to argue that the jury could convict defendant Vince Bryan Smith of first degree murder if Littleton acted with premeditation because Littleton was "the individual who actually fired" the fatal shots. Later, defense counsel urged the jury to view "the non-target offense through the eyes of Deshawn Littleton to decide whether or not he in fact committed murder." Counsel explained that if Littleton fired his weapon in self-defense, then there was no murder; on the other hand, if Littleton acted with premeditation, then he killed the victims to serve his own agenda, and thus the killings were not foreseeable.

1

On appeal, Smith argues that there was no valid proof of the nontarget offense of murder, and thus no valid proof of his derivative liability for that offense, because the evidence was insufficient for the jury to determine who shot each victim. But this argument fails. As both parties acknowledged at trial, and as the Attorney General argues on appeal, the evidence was plainly sufficient for the jury to conclude that Littleton shot and killed both victims. This conclusion, together with our holding that it does not matter whether Smith directly or indirectly aided and abetted Littleton as to the target crime (maj. opn., *ante*, at pp. 10–11), provides ample basis for us to affirm Smith's murder conviction.

Instead of affirming the judgment on this ground, the court opts to decide this case on the novel theory that the jury "could convict defendant of the murders despite uncertainty as to who exactly the killer was." (Maj. opn., *ante*, at p. 17.) While conceding that "substantial evidence would support a verdict on [the] basis" that Littleton shot both victims, the court says "we are not so sure that was the sole basis for the verdict given the uncertainty in the evidence and the trial court's instructions" and that "[i]t is possible that one or more of the jurors were not entirely certain exactly who fired the fatal shots." (*Id.* at pp. 18–19.) Of course it is "possible." But given that (1) both parties proceeded at trial on the theory that Littleton killed both victims and (2) substantial evidence readily supports this theory, I do not see why we need to go on and speculate. On this record, it is not necessary to decide whether Smith could be convicted of murder under the natural and probable consequences doctrine if the jury was unsure who killed each victim.

But the court decides the issue anyway, applying the rule that in order to convict a defendant of murder, the jury need not unanimously agree on the theory by which he is guilty. (See *People v. Santamaria* (1994) 8 Cal.4th 903, 918–919 (*Santamaria*).) According to the court, it would not matter if six jurors had concluded that Littleton (and no one else) shot and killed both victims, while six

2

other jurors had concluded that Tovey Moody (and no one else) killed both victims.  Despite these inconsistent theories, the court contends, each of the twelve jurors would have been convinced that two murders occurred; thus, Smith could be held liable for the murders so long as they were natural and probable consequences of the jumpout.  (Maj. opn., *ante*, at p. 18.)

Yet we have never applied the *Santamaria* rule in this way to affirm a murder conviction under a natural and probable consequences theory.  For support, the court cites a single case, *People v. Culuko* (2000) 78 Cal.App.4th 307, not mentioned by either party or by the Court of Appeal below.  *Culuko* held that the defendant could be convicted of murder *either* as a direct perpetrator who killed with malice *or* as an aider and abettor of a confederate who foreseeably killed with malice, and that the jury did not need to agree on which theory it found true.  (*Id.* at p. 323.)  Here, there was no suggestion that Smith committed murder as a direct perpetrator; the *only* theory of murder was one of natural and probable consequences.  The question is whether Smith can be convicted of murder on this sole theory if the jury was unsure who (excluding Smith) killed the victims.  *Culuko*, whatever its merits, did not address this issue.  (See *McWilliams v. City of Long Beach* (2013) 56 Cal.4th 613, 626 [" ' "[C]ases are not authority for propositions not considered." ' "].)  Given the lack of authority for the approach in today's opinion, it is no wonder the prosecutor did not advance this theory at trial.

Today's extension of the *Santamaria* rule is problematic because an essential element of proving that a defendant committed murder under a natural and probable consequences theory is valid proof that one (or more) of the defendant's confederates committed murder.  (See *People v. Prettyman* (1996) 14 Cal.4th 248, 267 [natural and probable consequences liability requires proof that "the defendant's confederate committed an offense other than the target crime(s)" (italics omitted)].)  Our case law has always held — and today's opinion does not

3

dispute — that independent and satisfactory proof of the nontarget offense is *itself* a necessary element of proving a defendant's vicarious liability for that offense under a natural and probable consequences theory. A finding by six jurors that Littleton (and no one else) committed murder, together with a finding by six other jurors that Moody (and no one else) committed murder, does not add up to a valid finding that *anyone* committed the nontarget offense of murder in this case. We have never said that murder can be proven that way, and we should not adopt a special rule here.

It is no answer to say that "[t]he jury certainly had to find that someone committed murder." (Maj. opn., *ante*, at p. 19.) To say the jury found that "someone committed murder" is a conclusory play on words. There is no finding of "murder" under the law simply because each of twelve jurors believes "someone" killed with malice. Even if Smith's liability for murder does not depend on whether Littleton or Moody (or anyone else) would be convicted of murder if tried in a *separate* proceeding (cf. *People v. Wilkins* (1994) 26 Cal.App.4th 1089, 1093–1096), it is essential that the jury in *this* proceeding find valid proof of the nontarget offense of murder.

As a point of contrast, it would not matter whether the jury could determine who killed each victim if the jury had found that *all* possible shooters acted with malice aforethought toward Hunt and McCarthy. In that scenario, each possible shooter would have been either a perpetrator or an aider and abettor of the murders and, as such, would have been liable for murder, no matter who actually shot each victim. But the jury instructions in this case did not require any such finding as to all possible shooters, and the record does not compel such a finding beyond a reasonable doubt.

In sum, a finding by each member of the jury that someone within the group of possible shooters killed the victims with malice — without any

4

agreement on the shooter's identity or a unanimous finding that all possible shooters acted with malice — is not valid proof that anyone committed the nontarget offense of murder. Without such proof, an essential element of Smith's liability for murder under a natural and probable consequences theory is missing. This difficulty is entirely avoidable because there was sufficient evidence for the jury to conclude that Littleton murdered both victims. In light of the evidence and arguments advanced by both parties at trial, there is no reason to indulge the speculative theory of the jury's verdict offered by today's opinion.

For the reasons above, I join the court in affirming Smith's murder conviction.

LIU, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Smith

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 215 Cal.App.4th 382
**Rehearing Granted**

_____

**Opinion No.** S210898
**Date Filed:** November 20, 2014

_____

**Court:** Superior
**County:** Riverside
**Judge:** Patrick F. Magers

_____

**Counsel:**

Gregory L. Cannon, under appointment by the Supreme Court ,for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons and Julie L. Garland, Assistant Attorneys General, Scott C. Taylor, Meredith S. White, Steven T. Oetting and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Gregory L. Cannon
Cannon & Harris
6046 Cornerstone Court West, Suite 141
San Diego, CA 92121-4733
(619) 392-2936

Steven T. Oetting
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101
(619) 645-2106