Filed 5/28/25  P. v. Contreras CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B331984 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA107579) |
| v. | |
| ESEQUEL CONTRERAS, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Hector E. Gutierrez, Judge.  Affirmed.

Law Offices of Michael R. Kilts, Michael R. Kilts and Joseph P. Farnan for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Heidi Salerno, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Esequel Contreras (defendant) appeals from the order denying his petition for vacatur of his murder conviction and for resentencing pursuant to Penal Code 1172.6.[1] Defendant contends the trial court should have considered his claim that CALCRIM No. 416, allowed the jury to impute malice to him based solely on his participation in an uncharged conspiracy. We have considered the argument and find no error in denying the petition. We thus affirm the trial court's order.

## BACKGROUND

### Defendant's 2010 conviction

In 2010, defendant was convicted after a jury trial of first degree murder in violation of section 187, subdivision (a). The jury found true allegations that a principal personally used a firearm within the meaning of section 12022.53, subdivisions (b), (c) and (d), and that the crimes were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)). The trial court sentenced defendant to a total term of 50 years to life in prison comprised of 25 years to life for the murder plus 25 years to life for the firearm enhancement under section 12022.53, subdivision (d).[2] This court affirmed the judgment in *People v. Contreras* (Jan. 29, 2013, B233109) (nonpub. opn.).

---

[1]    All further unattributed code sections are to the Penal Code unless otherwise stated.

[2]    Defendant was tried with codefendant Victor Zermeno, who was also convicted. The jury found true allegations that codefendant Zermeno personally and intentionally discharged a firearm causing great bodily injury or death to the victim. (§ 12022.53, subds. (b)–(d).)

2

**Relevant 2008 trial evidence**

In March 2008, then-Deputy District Attorney Andrew Kim testified he was assigned to prosecute the murder of Kenneth Taylor, alleged to have been committed by Richard Dominguez and Ubaldo Lozano. Deputy District Attorney Kim conducted a preliminary hearing, calling as his first witness Raul Gonzales, the victim in the current case. Deputy District Attorney Kim identified photographs of Gonzales, Dominguez, and Lozano. At the preliminary hearing Gonzales identified Dominguez and Lozano as the killers.

The prosecution's gang expert Detective Albert Carrillo was assigned to the sheriff's department task force targeting the Compton Varrio Tijuana Flats (Tijuana Flats) gang, which he described as a territorial gang with about 500 members. Detective Carrillo had personally investigated crimes within its territory, which includes Compton and several surrounding cities. Based upon Detective Carrillo's numerous contacts with Dominguez and Lozano and their individual admissions of membership in the Tijuana Flats gang, it was the detective's opinion they were members of that gang. Detective Carrillo prepared or executed hundreds of search warrants on Tijuana Flats gang members and had spoken with hundreds of its members, including Dominguez and Lozano. One of the investigations Deputy Carrillo had assisted was into the murder of Kenneth Taylor.

Detective Carrillo testified that in gang culture "respect" is an important concept. It is a form of fear that gangs use to instill in the community to discourage cooperation with law enforcement and in rival gang members to protect their territory and discourage interference in their ability to commit crimes. In

gang culture there is an expectation that a fellow gang member will put in "work" to prove themselves worthy of belonging to the gang. The "work" might range from narcotics sales, drive-by shootings, robberies, and committing murders. "Snitching" is considered disrespectful in gang culture. To give an example of snitching and the likely consequences to a witness in a preliminary hearing who identified a gang member seen murdering someone, Detective Carrillo said in gang culture, "there's a saying that snitches get stitches which means that if you tell on us, we are going to send you to the hospital or send you to the morgue. Either way, you're going to be getting stitches."

Sergeant Martin Rodriguez was the lead investigating deputy sheriff assigned to the Taylor murder and was present at the preliminary hearing of Dominguez and Lozano when Gonzales testified and identified them. Sergeant Rodriguez, in monitoring both the courtroom gallery and the hall outside, observed the presence of Tijuana Flats gang members inside and outside the courtroom. Ramiro Lozano, Ubaldo Lozano's brother and a Tijuana Flats gang member, was present during the preliminary hearing.[3] Sergeant Rodriguez spoke with Ramiro as he left the courtroom.

Gonzales was a regular customer of the Nueva Italia Bar, located in Tijuana Flats territory in Compton and where some members of the Tijuana Flats gang regularly gathered. In August 2008 Gonzales reported to Sergeant Rodriguez that Ramiro had threatened him while he was at the bar. Ramiro was

---

[3]     We will refer to Ramiro Lozano as Ramiro to avoid confusion with his brother Ubaldo, to whom we refer as Lozano.

4

arrested on September 1, 2008, for dissuading a witness. Sergeant Rodriguez spoke to Ramiro when he was booked and told Ramiro about the allegations made by Gonzales. Sergeant Rodriguez then arranged to have phone calls made by Ramiro while he was in custody recorded. That afternoon he personally monitored a telephone conversation between Ramiro and Jesus Cortez, an admitted member of the Tijuana Flats gang. In that conversation Ramiro complained the police had arrested him for intimidating a witness in the bar. Cortez replied, "Oh, man, we've got to get this mother', fool." In the early morning hours of September 6, 2008, Gonzales was fatally shot at the Nueva Italia Bar. He died of multiple gunshot wounds.

Two security guards, Juan H. and Freddy A., assigned to the Nueva Italia Bar when Gonzales was killed, witnessed the events that night as they worked inside and outside the bar. They each saw a black Ford pickup truck entering the bar parking lot around 11:00 p.m. with four occupants, park in a spot Juan H. indicated, and go into the bar. One of the four was carrying a Corona Beer bottle. Before the man was allowed into the bar, Juan H. told him he could not drink the beer inside and had to dispose of the beer or finish it. The man placed it on the ground outside the bar. Investigators later recovered the Corona bottle, and DNA recovered from the it matched Zermeno's DNA. DNA recovered from a Modelo Beer bottle located inside the bar also matched Zermeno's DNA.

Both security guards were able to give a physical description of the man with the beer as well as the driver of the truck. They each recalled the driver wearing a gray hoodie and a blue cap. In a photographic lineup, Juan H. identified Zermeno. He also identified defendant as the driver of the black truck from

another photographic lineup and identified a photograph of the black truck. Freddy A. was shown photographs of a black Ford truck, which he said resembled the truck he saw, including the Ford emblems on the tailgate.

Juan H. testified he personally searched Zermeno for weapons before Zermeno entered the bar. The four men from the black truck went in and out of the bar during the evening, sometimes individually and sometimes with one or two of the others. Some of them smoked near the parked truck. Eventually the four men left the bar and two got into the truck. Defendant was again in the driver's seat. Zermeno got a beer from the truck, started drinking it as the truck began to leave the parking lot. Juan H. went into the street to make sure it was clear for the truck to pull into the street. Zermeno remained in the parking lot.

Both guards saw the truck exit, turn right onto the street and pull up to the side of the bar parking lot on Rosecrans Avenue. After the truck stopped, Gonzales came out of the bar with Zermeno walking shoulder to shoulder with him toward the street. Freddy A. saw a second person on the other side of Gonzales. It appeared the two men were escorting Gonzales, holding him by his upper arms while he seemed to be trying to get away. As Gonzales and one of the men approached the black truck, Freddy A. saw the shooter holding a gun and then firing at the victim. Both guards heard four gunshots and saw Gonzales run toward the bar. Zermeno ran toward the open passenger-side door of the black truck. Once inside the bar, Gonzales fell on the floor. Zermeno got into the truck that left "very fast."

Defendant's girlfriend Lydia Alvarez owned a black Ford F-150 truck that she allowed defendant to drive sometimes. They

6

lived together in Temple City but would drive to Compton to visit defendant's mother. Deputy Sheriff Max Fernandez testified he arrested defendant on October 3, 2008, after stopping him while he was driving the black Ford truck. When Deputy Sherriff Fernandez asked him during booking about his gang membership, defendant admitted being a member of the Tijuana Flats gang and showed his Tijuana Flats related tattoos, including a tattoo of his gang moniker, "Pirate."

**The section 1172.6 petition**

In 2022, defendant filed a petition for vacatur of his murder conviction and resentencing pursuant to section 1172.6.

Former section 1170.95, now section 1172.6, provided a procedure to petition for retroactive vacatur and resentencing for those who could not be convicted of murder under sections 188 and 189 as amended effective January 1, 2019. (See *People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*).) Sections 188 and 189, the laws pertaining to felony murder and murder under the natural and probable consequences doctrine, were amended "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)

The 2019 amendments to sections 188 and 189 effectively eliminated murder liability under the natural and probable consequences doctrine and changed the requirements for felony-murder liability. (*People v. Gentile* (2020) 10 Cal.5th 830, 849.) Under current law and with exceptions not relevant here, "in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a

7

person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).) If the court finds the petitioner is entitled to relief, it is required to vacate the murder conviction and resentence defendant on any remaining counts. (§ 1172.6, subds. (c) & (d); *Lewis, supra*, 11 Cal.5th at p. 960.)

Defendant's petition alleged the three conditions for relief specified in subdivision (a) of section 1172.6, by alleging the charging document filed against him for murder allowed the prosecution to proceed under the felony-murder rule, the natural and probable consequences doctrine, or other theory under which malice is imputed to a person based solely on that person's participation in a crime, and that he could not presently be convicted of attempted murder because of changes to section 188 or 189 made effective January 1, 2019. After the trial court appointed counsel and the prosecution filed opposition, the court found defendant had made a prima facie showing of eligibility under section 1172.6, issued an order to show cause, and scheduled an evidentiary hearing.

Prior to the evidentiary hearing, defendant filed a motion to exclude certain gang evidence presented at trial. The trial court denied the motion, and the hearing proceeded on June 14, 2023. The court stated it had reviewed the petition and the parties' briefs, as well as the transcripts, jury instructions and exhibits 3 and 4 from defendant's trial, which the prosecutor had submitted. The court found the jury was not given any instructions on felony murder or natural and probable consequences, and the prosecution proceeded on the theory of aiding and abetting. The court found beyond a reasonable doubt there was sufficient evidence to support defendant's conviction of

murder under a currently valid theory of aiding and abetting. The court thus denied the petition.

Defendant filed a timely notice of appeal from the order of denial.

## DISCUSSION

Defendant's sole contention on appeal is the uncharged conspiracy instruction given at his trial allowed the jury to convict him on a theory of imputed malice. However, the trial court found beyond a reasonable doubt there was sufficient evidence to support defendant's conviction of murder under a currently valid theory of aiding and abetting.[4] Defendant does not address this finding and provides only a condensed summary of the evidence presented at his trial. On appeal, a judgment or order of the trial court is presumed correct and supported by substantial evidence. (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573–1574.) "Issues do not have a life of their own: if they

---

[4] The court presumably meant *direct* aiding and abetting. Direct aiding and abetting also remains a valid theory of murder. (See *In re Lopez* (2023) 14 Cal.5th 562, 587.) "[F]or a defendant to be liable for first degree murder as a direct aider and abettor, 'the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission.'" (*Ibid.*) The jury was instructed that to be guilty of aiding and abetting, the People must prove defendant knew the perpetrator intended to commit "the crime" and intended to facilitate "the crime." Although the instruction did not say defendant must know of and share the intent to *murder*, murder was the only crime charged against both defendants.

9

are not raised or supported by argument or citation to authority, we consider the issues waived." (*Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99.)[5]  As defendant has forfeited any claim that substantial evidence did not support the trial court's ruling, we presume the evidence was sufficient.

Furthermore, defendant has failed to demonstrate error with regard to the issue he has raised.  He contends CALCRIM No. 416, the instruction on uncharged conspiracy, allowed the jury to convict him of murder on the currently invalid theory under section 188, subdivision (a)(3), of imputation of malice based solely on his participation in the uncharged conspiracy.

Defendant's claim this was a currently invalid theory is based on the state of the law at the time of his conviction, which he attempts to illustrate by quoting *People v. Kauffman* (1907) 152 Cal. 331 and citing *People v. Smith* (2014) 60 Cal.4th 603. Those cases state that "'where several parties conspire or combine together to commit any unlawful act, each is criminally responsible for the acts of his associates or confederates committed in furtherance of any prosecution of the common design for which they combine. . . .  Each is responsible for everything done by his confederates, which follows incidentally in the execution of the common design as one of its probable and natural consequences, even though it was not intended as a part of the original design or common plan.'" (*People v. Kauffman, supra*, at p. 334; see *People v. Smith, supra*, at pp. 616–617.)  The authorities cited by defendant may illustrate the state of the law applicable to the issues discussed in *those* cases, but they do not

---

[5]     Not only did defendant fail to raise the issue in his opening brief, he also did not file a reply brief, although the People had discussed defendant's omission in their respondent's brief.

10

illustrate the law applicable in this case; nor do they reflect the language of the conspiracy instruction given to defendant's jury at the time of his trial. This is so because defendant was charged with and convicted of just *one* crime: murder.

CALCRIM No. 416 instructs in relevant part: "The People contend that the defendants conspired to commit one of the following crimes: *Murder*"; "To prove that the defendants were members of a conspiracy in this case, the People must prove . . . [¶] . . . the defendants intended to agree and did agree with Ramiro Lozano and Jesus Cortez to commit *murder*"; "The People must prove that the members of the alleged conspiracy had an agreement and *intent to commit murder*."[6] (Italics added.) Long before defendant's trial the California Supreme Court held that "conviction of conspiracy to commit murder requires a finding of intent to kill" (*People v. Swain* (1996) 12 Cal.4th 593, 607), and the holding has remained valid after the passage of Senate Bill No. 1437 (2017–2018 Reg. Sess.). (*In re Lopez, supra*, 14 Cal.5th at p. 588.) "'[A]ll conspiracy to commit murder is necessarily conspiracy to commit premeditated and deliberated first degree murder.'" (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 641.)

Here, there was no allegation, evidence, or instruction suggesting that defendant conspired to commit some act other than murder or that he was convicted of an unintended murder committed by a perpetrator of a lesser intended crime and thus guilty by imputation. CALCRIM No. 416 clearly instructed that to find defendant guilty of murder as a coconspirator, he must be found to have harbored the "intent to commit murder." As

---

[6] Unlike defendant, we quote from the reporter's transcript of his trial, as it can occasionally differ from the printed instruction.

11

defendant was "'charged with conspiracy *to murder*, not conspiracy to commit a lesser crime that resulted in murder'" he is ineligible for relief under section 1172.6 as a matter of law. (*People v. Medrano* (2021) 68 Cal.App.5th 177, 179, 183, 186, quoting in part *People v. Beck & Cruz, supra*, 8 Cal.5th at p. 645.)[7]

As defendant is ineligible for relief under section 1172.6 as a matter of law, we conclude the trial court did not err in denying his petition.

## DISPOSITION

The denial of defendant's section 1172.6 petition is affirmed.

CHAVEZ, J.

We concur:

LUI, P. J.

ASHMANN-GERST, J.

---

[7]    Defendant complains that although he argued this issue in the trial court, the court did not address it. We "review the trial court's *ruling*, not its reasoning." (*People v. Turner* (2020) 10 Cal.5th 786, 807.)

12