Filed 4/29/15  P. v. Richardson CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>JERRY ALAN RICHARDSON,<br><br>  Defendant and Appellant. | H039069<br>(Santa Clara County<br>Super. Ct. Nos. C1102789, C1111730,<br>C1114026, C1234653) |

Defendant Jerry Alan Richardson was sentenced concurrently in four cases. In case No. C1111730, defendant appeals from a judgment of conviction following a jury trial. (See Pen. Code, § 1237.)[1] In case Nos. C1102789, C1114026, and C1234653, he appeals from judgments of conviction following pleas of no contest. (See § 1237.5; Cal. Rules of Court, rule 8.304(b)(4).)

In each of the four cases, defendant argues that his trial counsel rendered ineffective assistance by not objecting to the court's imposition of a booking fee in the amount of $259.50. In addition, in case No. C1111730, defendant asserts instructional error and section 654 error.

After careful consideration, we reject defendant's claims of error.

---

[1]     All further statutory references are to the Penal Code unless otherwise stated.

# I

## Case No. C1111730

### A. *Procedural History*

By second amended information, filed July 31, 2012, defendant was charged with four felonies committed on or about July 18, 2011. It also alleged a prior strike conviction under the Three Strikes Law (§§ 667, subds. (b)-(i); 1170.12), a prior serious felony conviction (§§ 667, subd. (a); 1192.7), and three prior prison terms (§ 667.5, subd. (b)).

Following a trial, the jury found defendant guilty as charged of the following: kidnapping during a carjacking of Anthony Patino (§ 209.5)[2] (count 1), second degree robbery of Patino (§§ 211-212.5, subd. (c)) (count 2), and two counts of taking or driving a vehicle (Veh. Code, § 10851, subd. (a))[3] (counts 3 & 4). Defendant admitted the enhancement and strike allegations.

---

[2]    Section 209.5, subdivision (a), provides "Any person who, during the commission of a carjacking and in order to facilitate the commission of the carjacking, kidnaps another person who is not a principal in the commission of the carjacking shall be punished by imprisonment in the state prison for life with the possibility of parole." "For section 209.5(a) to apply, the victim must be moved 'beyond [what is] merely incidental to the commission of the carjacking' and 'a substantial distance from the vicinity of the carjacking,' and 'the movement of the victim increases the risk of harm to the victim over and above that necessarily present in the crime of carjacking itself.' (§ 209.5, subd. (b).) [¶] In turn, carjacking is defined as 'the felonious taking of a motor vehicle in the possession of another, from his or her person or immediate presence, or from the person or immediate presence of a passenger of the motor vehicle, against his or her will and with the intent to either permanently or temporarily deprive the person in possession of the motor vehicle of his or her possession, accomplished by means of force or fear.' (§ 215, subd. (a); see *People v. Lopez* (2003) 31 Cal.4th 1051 (*Lopez*) [carjacking requires asportation or movement].)" (*People v. Medina* (2007) 41 Cal.4th 685, 693.)

[3]    Vehicle Code section 10851, subdivision (a), provides in pertinent part: "Any person who drives or takes a vehicle not his or her own, *without the consent of the owner* thereof, and with intent either to permanently or temporarily deprive the owner thereof of his or her title to or possession of the vehicle, whether with or without intent to steal the vehicle, or any person who is a party or an accessory to or an accomplice in the driving or (continued)

B. *Evidence*

1. *The Prosecution's Case*

Geeno Gular, a robbery detective in the San Jose Police Department, was assigned to investigate the kidnapping of Patino during a carjacking on July 18, 2011. On July 20, 2011, Detective Gular was advised that an Isuzu belonging to Ernie Garcia, Patino's stepfather, had been recovered by the San Jose Police department at about 9:00 a.m. in the area of Meridian Avenue and Douglas Street. Eventually, Detective Gular had the vehicle swabbed for DNA and fingerprints collected from it.

On July 22, 2011, Detective Gular learned that John Reed had been arrested at 702 Vine Street, San Jose. In connection with that arrest, officers had seized property that had been taken from Garcia's Isuzu. Detective Gular examined the cell phone seized from Reed. A text message received at about 10:30 a.m. on July 20, 2011 from 408-518-9692 was found on Reed's cell phone. It read: "Cops got trooper. Where you at? j. phone."[4]

Detective Gular obtained search warrants for the cellular telephone records relating to Reed's cell phone number and the sender's cell phone number. The Metro PCS records identified the subscriber for 408-518-9692 as "Jerry Rich" and verified that the text message to Reed was sent from that cell phone number. The records indicated that the account activation date for 408-518-9692 was July 19, 2011. At trial, Detective Gular acknowledged that there was no record of any call being made from Reed's cellular phone number to 408-518-9692 on July 18, 2011. The Metro PCS records reflected there

---

unauthorized taking or stealing, is guilty of a public offense . . . ." (Italics added.) Under the elements test, "the crime of unlawfully taking a vehicle is not a lesser included offense of carjacking . . . ." (*People v. Montoya* (2004) 33 Cal.4th 1031, 1035.) " 'Carjacking is a crime against the possessor or passengers in a vehicle. [Unlawful taking of a vehicle] is a crime against ownership.' " (*Id.* at p. 1035.)

[4] Garcia's vehicle was an Isuzu Rodeo not an Isuzu Trooper.

were about four telephone calls made to or from the 408-518-9692 number to Reed's number on July 19, 2011.

Detective Gular had a map prepared using the cell phone records obtained from Metro PCS. It showed the Metro PCS call activity for 408-518-9692 from 4:00 a.m. on July 20, 2011 through 1:00 p.m. on July 23, 2011. The map identified the location where the Isuzu was recovered. Twenty-one texts or cell phone calls had been made from the 408-518-9692 number between 4:54 a.m. and 10:47 a.m. on July 20, 2011. The text that included the message "[c]ops got trooper" was sent from that number to Reed's number at 10:38 a.m. on July 20, 2011. Those 21 calls and texts were transmitted through Metro PCS cell tower No. 122, the tower closest to where the Isuzu was recovered on Meridian Avenue at Douglas Street. A call at 10:58 a.m. was transmitted through the next closest cell phone tower, which indicated the caller was moving away from the cell phone tower closest to the location where the Isuzu was recovered.

On September 27, 2011, Detective Gular interviewed defendant. He verified that his cell phone number was 408-518-9692 and his subscriber name was Jerry Rich. He confirmed that he knew Reed, they were friends, and they had known each other for 10 to 12 years.

Detective Gular obtained the Sprint Wireless cellular telephone records for 408-482-6146, Reed's cell telephone number. Crime analysts used that information to create a map showing the call activity for that number during the period 2:30 a.m. to 9:00 a.m. on July 18, 2011. The map identified the location where the victim was kidnapped at about 3:00 a.m. on July 18, 2011 and the location of the Lowe's hardware store on Cottle Road where the victim was dropped off later that morning. The nearby Sprint Wireless cell tower No. 56 detected telephone calls from Reed's number between 2:32 a.m. through 7:41 a.m. on July 18, 2011.

Garcia testified that on July 18, 2011, his wife, his daughter, his stepson Patino, and he lived in a house on Garces Avenue, San Jose. At that time, Garcia owned an

4

Isuzu Rodeo. Around 5:00 a.m. on July 18, 2011, Garcia noticed his car, which had been parked on the street, was missing. At that time, Garcia believed that Patino was asleep in his room upstairs.

On July 18, 2011, Garcia was the coach of a girls' softball team called the Strikkers. His Isuzu contained equipment for the team, including T-shirts, batting gloves, bats, and bat bags. Garcia's California driver's license was also in the vehicle.

On the morning of July 22, 2011, Garcia received a call from the police. He was asked to identify recovered property, including his driver's license, T-shirts, and softball equipment.

Garcia had not given permission to defendant or Reed to take his Isuzu or his property. When his Isuzu was returned to him, the vehicle's speakers and stereo and his work clothes and shoes were missing from the vehicle.

Patino testified that, on July 18, 2011, he lived on Garces Avenue in San Jose with his parents. Patino returned home at around 3:20 a.m. on July 18, 2011. He was driving a four-door Toyota Corolla belonging to his sister's boyfriend, Omar Jimenez. He parked the car on the street and walked toward the front door of his house. As Patino walked by the tall bushes separating the sidewalk from his front yard, a person appeared and he put a small black gun to his face. The gunman was taller than Patino, who was five feet six inches tall. The gunman was wearing all black and his face was covered with something like a ski mask. The gunman told Patino to get back in the car.

Patino got into the driver's seat and the gunman got into the front passenger's seat. The gunman continued to aim his gun at Patino and told Patino to drive. In the rearview mirror, Patino saw the lights to his stepdad's Rodeo go on and the vehicle follow behind him. The gunman instructed Patino to drive around the corner and then told him to get out of the car.

5

At that point, the gunman blindfolded Patino with what Patino thought was a shirt and put Patino in the back seat of the Toyota Corolla. The gunman told Patino to lie there and be quiet and the gunman began driving.

Patino heard the gunman talking very quickly on the phone. The gunman said, "We got this kid. Change of plans. I had to take this kid with us. He came out of nowhere." The gunman said that "he was pulling a lick on this car and [Patino] happened to show up" "[s]o he decided to take [Patino]." The gunman told Patino that Patino "just happened to be at the wrong place at the wrong time." The gunman said that he thought that Patino had seen him stealing the Isuzu and indicated that was the reason he took Patino.

Patino noticed that the driver was smoking; he smelled the "heavy scent" of cigarettes. The gunman told someone on the phone that he was going to have someone watch Patino.

At some point the gunman asked Patino whether there was anything valuable in his house. Patino answered no. The gunman took Patino's debit card, about $15 or less, and Patino's iPhone.

Patino was put into a small shed with a window. The gunman talked about tying Patino up but he did not actually do so after Patino promised to "listen to whatever he wants." At some later point, Patino noticed it was very quiet. He removed the shirt from his face. Patino was the only person in the shed. He was locked in. He was too scared to do anything and he just sat there.

When it was beginning to get light outside, Patino heard a car pull up and he put the blindfold back on but he left a little space so he could see out of the corner of his eye. Patino thought that the gunman, judging by his voice, had returned. Patino was placed into the backseat of the Toyota Corolla and they drove away. Patino heard the gunman talking to someone who was either on the cell phone or in the car. They passed a

6

Taco Bell and a Wal-Mart sign. The car stopped in, Patino believed, the Wal-Mart parking lot.

Patino heard a woman ask, "Who's that?" The gunman responded, "Some kid. I had to take him." She told the gunman that he was stupid and dumb for doing so and asked why he did it. The gunman instructed her to follow him.

Patino was dropped off and told to count to one hundred before taking off his blindfold. Patino believed, based on a distinctive clicking sound, that he heard his stepfather's Isuzu Rodeo start up and take off. When he took off the blindfold, he saw the others had gone and he was in a Lowe's parking lot located at 5550 Cottle Road. He thought this location was a very short drive from the shed where he had been held.

Patino found the keys in the ignition of the Toyota Corolla. The Toyota Corolla was a mess; papers and things were everywhere. Patino drove home and, when he arrived home, he called the police. His sister's money and iPod had been taken from the vehicle.

At trial, Patino indicated that he could not identify the men involved. He did not recognize defendant. Patino testified that he had never consented to go with the gunman. He had not recovered his belongings.

Jason Tanner was assigned as a detective in the robbery unit. He worked with Detective Gular in the case involving the kidnapping of Patino during a carjacking. On July 26, 2011, Detective Tanner helped process a 1998 Isuzu Rodeo belonging to Garcia. The detective was one of the officers lifting fingerprints from the vehicle and placing them on lift cards. He lifted a fingerprint from the exterior door frame, placed it on a lift card, and recorded a description and diagram of the fingerprint's location on the card. The detective conceded that he did not know when the fingerprint was placed there. Detective Tanner sent the lift cards to the central identification unit for analysis.

Detective Tanner described the collection of DNA using swabs from Garcia's vehicle. The detective also obtained a DNA swab from defendant's mouth. The evidence was sent to the crime lab for analysis.

Eva Chun, who was qualified by the trial court as an expert in the field of fingerprint analysis and identification, compared latent fingerprint lift cards to the prints of four subjects, including defendant. One latent fingerprint of a right index finger matched defendant's fingerprint.

Craig Lee, who was qualified by the court as an expert in the field of forensic biology, testified that he was a criminalist at the Santa Clara County crime laboratory. Lee received 16 swabs taken from various areas of a car and reference DNA samples from Patino and Garcia. Lee also had an on-file reference DNA sample from defendant.

Lee determined that Garcia and defendant were possible contributors to the DNA mixture derived from the steering wheel swab. The likelihood of that DNA mixture profile was extremely more likely if the DNA mixture had originated from Garcia and defendant than if it had originated from Garcia and an unknown individual in the African-American, Caucasian, or the United States Hispanic population. Stated another way, it was very highly likely that Garcia and defendant were the contributors rather than Garcia and an unknown individual.

As to the DNA mixture derived from the interior door handle on the driver's side, Lee determined that at least three individuals, including one male, had contributed. Defendant could be neither included nor excluded.

Lee determined that at least three individuals, including one male, contributed to the DNA mixture derived from the gear-shift lever. Again, it was inconclusive whether defendant was a possible contributor.

Lee received two cigarette butts but he was not able to make any useful DNA determinations.

8

Fernando Pedreira testified that he was a San Jose police officer. On July 22, 2011, at about 10:00 a.m., Officer Pedreira contacted a male individual who was walking on Virginia Avenue and appeared to be under the influence. Officer Miri and Officer Ferrante were also present. A methamphetamine pipe was discovered during a parole search of the man and a follow up parole search of his residence, an apartment on Vine Street, was conducted.

Reed was on the couch in that apartment. A parole search of Reed was conducted. Reed appeared to be under the influence and was arrested. "Shaved" Toyota and Honda keys used to burglarize cars were found on Reed. Property suspected of being stolen was found in Reed's backpack. The property included softball team apparel that matched items found in a stolen Honda Accord parked in the parking lot just outside the apartment. A brown leather bag associated with Reed was seized. It contained items associated with burglaries, including a flashlight with a light diffuser, duct tape, a tire wrench, rope, and keys.

T-shirts with "Strikkers" in red lettering, other Strikker softball apparel, duffel bags, and batting gloves were recovered from the stolen Honda Accord's trunk. A driver's license belonging to Garcia was also found and Garcia was contacted to identify the property stolen from his Isuzu Rodeo.

2. *Defense Case*

Reed's booking sheet, defense exhibit A, which reflected Reed was five feet, 11 inches tall was admitted into evidence. The defense rested.

C. *Natural and Probable Consequences*

At trial, the prosecutor conceded he could not prove that defendant was the gunman. The prosecution's only theory of culpability as to counts 1 and 2 was that defendant was guilty of those offenses under the natural and probable consequences doctrine.

9

Defendant argues that his convictions of kidnapping during a carjacking (count 1) and robbery (count 2) must be reversed because the trial court erred in instructing on the natural and probable consequences doctrine. He maintains that it could not be rationally inferred that those crimes were natural and probable consequences of auto theft and, therefore, the court's instruction provided an impermissible avenue to convict him.

1. *Instruction*

At trial, the court instructed: "A person may be guilty of a crime in two ways: [¶] 1. He may have directly committed the crime. I will call that person the "Perpetrator"; [¶] 2. He may have aided and abetted a perpetrator who directly committed the crime. [¶] A person is guilty of a crime whether he committed it personally or aided and abetted." The court instructed the jury on the law of aiding and abetting.

The court also instructed on the natural and probable consequences doctrine: "Defendant is charged in Count 1 with kidnapping during a carjacking and in Count 2 with robbery. [¶] You must first decide whether defendant is guilty of theft of a vehicle. If you find the defendant is guilty of this crime, you must decide whether he is guilty of Counts 1 and 2. [¶] Under certain circumstances, a person who is guilty of one crime may also be guilty of other crimes that are committed at the same time."

It also instructed: "To prove that the defendant is guilty of Counts 1 and 2, the People must prove that: [¶] 1. The defendant is guilty of theft of a vehicle; [¶] 2. During the commission of the theft of a vehicle, a coparticipant in the crime committed the crime of kidnapping during a carjacking and/or robbery; and [¶] 3. Under all the circumstances, a reasonable person in defendant's position would have know that the commission of a kidnapping during a carjacking and/or robbery was a natural and probable consequence of the commission of the theft of a vehicle. [¶] A coparticipant in a crime is a perpetrator or anyone who aided and abetted the perpetrator. It does not include a victim or innocent bystander."

10

The court further instructed:  "A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence.  If the kidnapping during a carjacking and/or robbery was committed for a reason independent of the common plan to commit the theft of a vehicle, then the commission of a kidnapping during a carjacking and/or robbery was not a natural and probable consequence of theft of a vehicle."[5]

2. *Liability as an Aider and Abettor*

"An aider and abettor is guilty not only of the intended, or target, crime but also of any other crime a principal in the target crime actually commits (the nontarget crime) that is a natural and probable consequence of the target crime.  (*People v. Chiu* [2014] 59 Cal.4th [155,] 161; *Prettyman* [(1996)] 14 Cal.4th [248,] 260.)"[6]  (*People v. Smith*, *supra*,

---

[5]     The California Supreme Court has recently held that an instruction adapted from CALCRIM No. 402 did not "correctly state the law of aider and abettor liability" and was "unduly favorable" to the defendant because it instructed that, if the nontarget crime was committed for a reason independent of the common plan to commit the target crime, that the nontarget crime was not a natural and probable consequence of the target crime. (*People v. Smith* (2014) 60 Cal.4th 603, 617; see *id.* at p. 613.)  The court stated that "[i]f the prosecution can prove the nontarget crime was a reasonably foreseeable consequence of the crime the defendant intentionally aided and abetted, it should not additionally have to prove the negative fact that the nontarget crime was not committed for a reason independent of the common plan." (*Id.* at p. 617.)  "In a given case, a criminal defendant may argue to the jury that the nontarget crime was the perpetrator's independent idea unrelated to the common plan, and thus was *not* reasonably foreseeable and *not* a natural and probable consequence of the target crime.  But that would be a factual issue for the jury to resolve [citation], not a separate legal requirement." (*Ibid.*)

[6]     In *People v. Beeman* (1984) 35 Cal.3d 547, the California Supreme Court established that an aider and abettor must "act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*Id.* at p. 560.)  "When the definition of the offense includes the intent to do some act or achieve some consequence beyond the *actus reus* of the crime [citation], the aider and abettor must share the specific intent of the perpetrator. . . . [A]n aider and abettor will 'share' the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or (continued)

60 Cal.4th at p. 611.) "To apply the 'natural and probable consequences' doctrine to aiders and abettors is not an easy task. The jury must decide whether the defendant (1) with knowledge of the confederate's unlawful purpose, and (2) the intent of committing, encouraging, or facilitating the commission of any target crime(s), (3) aided, promoted, encouraged, or instigated the commission of the target crime(s); whether (4) the defendant's confederate committed an offense *other than* the target crime(s); and whether (5) the offense committed by the confederate was a natural and probable consequence of the target crime(s) that the defendant encouraged or facilitated." (*People v. Prettyman*, *supra*, 14 Cal.4th at p. 267 (*Prettyman*).)

"A consequence that is *reasonably foreseeable* is a natural and probable consequence under this doctrine. 'A nontarget offense is a " 'natural and probable consequence' " of the target offense if, judged objectively, the additional offense was reasonably foreseeable. [(*People v. Medina* (2009) 46 Cal.4th 913, 920.)] The inquiry does not depend on whether the aider and abettor actually foresaw the nontarget offense. (*Ibid*.) Rather, liability " 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' " (*Ibid*.) Reasonable foreseeability "is a factual issue to be resolved by the jury." (*Id*. at p. 920.)' (*People v. Chiu*, *supra*, 59 Cal.4th at pp. 161-162.)" (*People v. Smith*, *supra*, 60 Cal.4th at p. 611.)

" 'By its very nature, aider and abettor culpability under the natural and probable consequences doctrine is not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense was not intended at all. It imposes vicarious liability for any offense committed by the direct perpetrator that is a

_____

encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime. [Citations.]" (*Ibid*.) A defendant's intent to encourage or facilitate the actions of the perpetrator of the target offense must be formed prior to or during commission of that offense. (See *People v. Montoya* (1994) 7 Cal.4th 1027, 1039.)

12

natural and probable consequence of the target offense. [Citation.] Because the nontarget offense is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant and culpability is imposed simply because a reasonable person could have foreseen the commission of the nontarget crime.' [Citation.]" (*People v. Chiu*, *supra*, 59 Cal.4th at p. 164.)

" '[T]o be reasonably foreseeable "[t]he consequence need not have been a strong probability; *a possible consequence* which might reasonably have been contemplated *is enough . . . .*" [Citation.]' [Citation.]" (*People v. Medina*, *supra*, 46 Cal.4th at p. 920 (*Medina*), italics added.) "To trigger application of the 'natural and probable consequences" doctrine, there must be a close connection between the target crime aided and abetted and the offense actually committed." (*Prettyman*, *supra*, 14 Cal.4th at p. 269.) "Murder, for instance, is *not* the 'natural and probable consequence' of 'trivial' activities." (*Ibid*.)

"The trial court should grant a prosecutor's request that the jury be instructed on the 'natural and probable consequences' rule only when (1) the record contains substantial evidence that the defendant intended to encourage or assist a confederate in committing a target offense, and (2) the jury could reasonably find that the crime actually committed by the defendant's confederate was a 'natural and probable consequence' of the specifically contemplated target offense. If this test is not satisfied, the instruction should not be given, even if specifically requested." (*Prettyman*, *supra*, 14 Cal.4th at p. 269.)

3. *Trial Court did not Err in Instructing on Natural and Probable Consequences*

Defendant argues that the trial court erred in instructing on natural and probable consequences doctrine because "kidnapping during carjacking and robbery were not the natural and probable consequences of an auto theft in the middle of the night." He contends that it could not be rationally inferred that "kidnapping or robbery was reasonably foreseeable from breaking into cars in a residential area at 3:20 a.m."

13

Defendant asserts that Reed and he "chose a quiet residential neighborhood" in which to take a vehicle and "[t]o the extent there was any forethought to the auto theft, it was to avoid people and the chance of violence." He maintains that he was "breaking into cars in a residential area in the wee hours of the morning, at a time calculated to avoid being seen by witnesses."

Defendant also relies on *People v. Leon* (2008) 161 Cal.App.4th 149 (*Leon*). He maintains that the natural and probable consequences theory was even "more tenuous here than in *Leon*."

Again, the question is "not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable. (*People v. Prettyman*, *supra*, 14 Cal.4th at pp. 260-262.)" (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1133.) As indicated, the issue whether a crime is a reasonably foreseeable consequence is ordinarily a factual question to be resolved by the jury who evaluates all the factual circumstances of the individual case. (*Medina*, *supra*, 46 Cal.4th at p. 920.)

In *Leon*, there was evidence that Leon and another man later identified as Javier Rodriguez, both members of the same gang, were burglarizing a vehicle in an apartment parking lot located in a rival gang's territory. (*Leon*, *supra*, 161 Cal.App.4th at pp. 153-155.) When someone witnessing the crime threatened to call police, Rodriguez fired a gun into the air. (*Ibid*.) The appellate court held that the evidence was insufficient to prove that "Leon aided and abetted a crime as to which witness intimidation was a natural and probable consequence" and reversed the conviction. (*Leon*, *supra*, at p. 161.) It stated: "The People have cited no case, and we are aware of none, in which a court has concluded that the crime of witness intimidation was the natural and probable consequence of either vehicle burglary or illegal possession of a weapon. There is not 'a close connection' between any of the target crimes Leon aided and abetted, and Rodriguez's commission of witness intimidation. (*Prettyman*, *supra*, 14 Cal.4th at p. 269.) In considering 'all of the circumstances surrounding the incident'

14

[citation], the fact that the crimes were gang related and that they were committed in a rival gang's territory clearly increased the possibility that violence would occur. However, witness intimidation cannot be deemed a natural and probable consequence of any of the target offenses." (*Ibid.*)

This case is similar to *Leon* in that Patino surprised the gunman while defendant and he were in the process of committing a vehicular crime. In our view, a nontarget crime of intimidation or violence against a victim of, or an apparent eyewitness to, a crime in progress may reasonably be considered a natural and probable consequence of a target offense under certain circumstances. It is enough that a reasonable person in the defendant's position would have or should have known that the offenses charged in counts 1 and 2 were reasonably foreseeable consequences of the crime that defendant aided and abetted. (*Medina*, *supra*, 46 Cal.4th at p. 920.)

Regardless whether we agree with *Leon*, the evidence in this case was sufficient to allow the jury to decide, as a factual matter, whether the crimes charged in counts 1 and 2 were the natural and probable consequences of a taking of a vehicle. The timing of the crime was only one of the surrounding circumstances. Although it is less likely for people to be around at around 3:20 a.m. than during the daytime, the crime was being committed on a street where people lived and residents or their visitors could return to or come out of their homes at any hour. The gunman was inferably acting as a lookout against such persons while the Isuzu was being taken by the direct perpetrator. Patino was returning home when the gunman, who believed Patino had just witnessed the taking of the Isuzu, took Patino in an apparent attempt to avoid detection and also took the car that Patino had been driving.

The intended crime was the taking of a vehicle. A carjacking is closely related to the taking of a vehicle in violation of Vehicle Code section 10851; one offense is against a person and the other is against ownership. (See fns. 2 & 3, *ante*.) A kidnapping during a carjacking of a possible eyewitness to a target crime of taking a vehicle is not so

15

attenuated that it can never be a natural and probable consequence of that target crime. The connection of the robbery of that victim, another opportunistic theft crime, is not so attenuated as to preclude application of the natural and probable consequences doctrine under the evidence presented.

We repeat: " '[T]o be reasonably foreseeable "[t]he consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough . . . ." [Citation.]' [Citation.]" (*People v. Medina*, *supra*, 46 Cal.4th at p. 920.) Contrary to defendant's assertion, based on the evidence in this case, a rational trier of fact could find that the kidnapping during carjacking and robbery of the kidnapping victim were reasonably foreseeable consequences of a taking of a vehicle and it was appropriate for the court to instruct on a natural and probable consequences theory of culpability. Therefore, insofar as defendant additionally argues that his counsel rendered ineffective assistance by not objecting to the court's instruction on the ground that it could not be rationally inferred that those nontarget crimes were "the natural and probable consequences of an auto theft in the middle of the night," the argument fails. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687-689, 694 (*Strickland*).)

D. *Multiple Punishment Barred by Section 654*

In imposing punishment on count 4 (taking of Toyota Corolla) at sentencing, the trial court stated: "Count 4 is a separate victim from Count 1 [kidnapping during carjacking]. So I'll go consecutive here. And that's one year and four months or one-third the doubled midterm pursuant to 667(i) [*sic*] through (i) and 1170.12." Defendant argues that section 654 required the trial court to stay the punishment imposed upon his conviction of count 4 "[s]ince the commission of the auto theft and the kidnapping during a carjacking were the same act . . . ." On appeal, the People argue that section 654 did not bar punishment for both offenses because defendant and Reed "had multiple or simultaneous objectives when taking Patino and his car, which were independent of and not merely incidental to each other . . . ."

16

Under section 654, "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) "[I]t is well settled that section 654 applies not only where there was but one act in the ordinary sense, but also where there was a course of conduct which violated more than one statute but nevertheless constituted an indivisible transaction. (*People v. Beamon* [(1973)] 8 Cal.3d [625,] 637.)" (*People v. Perez* (1979) 23 Cal.3d 545, 551 (*Perez*).) Although there is a multiple victim exception to section 654 for crimes of violence against multiple victims (see *People v. Correa* (2012) 54 Cal.4th 331, 341), it does not apply here.

"The initial inquiry in any section 654 application is to ascertain the defendant's objective and intent. If he entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct." (*People v. Beamon*, *supra*, 8 Cal.3d at p. 639.) "Whether a course of conduct is indivisible depends upon the intent and objective of the actor. (*Neal v. State of California* [(1960)] 55 Cal.2d [11,] 19.) If all the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one. (*Ibid.*)" (*Perez*, *supra*, 23 Cal.3d at p. 551; see *People v. Correa*, *supra*, 54 Cal.4th at pp. 334, 344 [disapproving dictum in *Neal v. State of California* and concluding that section 654 does not necessarily bar multiple punishment for multiple violations of the same provision of law].) "On the other hand, if the evidence discloses that a defendant entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for the independent violations committed in pursuit of each objective even though the violations were parts of an otherwise indivisible course of conduct. [Citations.]" (*People v. Perez*, *supra*, 23 Cal.3d at pp. 551-552.)

17

"The defendant's intent and objective are factual questions for the trial court, and we will uphold its ruling on these matters if it is supported by substantial evidence. (*People v. Coleman* (1989) 48 Cal.3d 112, 162.)" (*People v. Perry* (2007) 154 Cal.App.4th 1521, 1525; *People v. Osband* (1996) 13 Cal.4th 622, 730.) Here, the evidence showed that defendant and the gunman set out to take a vehicle and were in the process of taking the Isuzu when the gunman was surprised by Patino. No doubt a carjacking and the taking of the vehicle in violation of Vehicle Code section 10851 may be committed pursuant to a single objective of taking a vehicle, but the evidence here indicates that the co-participant harbored the separate and independent intent of avoiding detection of the taking of the Isuzu when he took Patino. Substantial evidence supports the court's implicit finding that the direct perpetrator of counts 1 and 4 entertained independent, dual objectives when committing those crimes. The trial court did not violate section 654 by imposing punishment on the conviction of kidnapping during carjacking (count 1) and the conviction of taking or driving the Toyota Corolla (count 4).

II

*Booking Fees*

A. *Background and Appellate Argument*

As to case Nos. C1111730, C1102789, C1114026, and C1234653, defendant argues that his trial counsel rendered ineffective assistance by not objecting to the imposition of a $259.50 booking fee payable to the county in each case. (See Gov. Code, §§ 29550-29550.2.)[7] Defendant argues that, at the time of sentencing in 2012, there was

---

[7] Government Code section 29550, subdivision (c), provides in part: "Any county whose officer or agent arrests a person is entitled to recover from the arrested person a criminal justice administration fee for administrative costs it incurs in conjunction with the arrest if the person is convicted of any criminal offense related to the arrest, whether or not it is the offense for which the person was originally booked." Government Code section 29550, subdivision (d), provides in part: "When the court has been notified in a (continued)

no evidence of his ability to pay those booking fees and the case of *People v. McCullough* (*People v. McCullough* (2013) 56 Cal.4th 589) was pending before the California Supreme Court. Defendant maintains that, therefore, his trial counsel was on notice of the need to object to preserve any claim that defendant was unable to pay the jail booking fees imposed by the trial court at sentencing.

In *People v. McCullough*, *supra*, 56 Cal.4th at p. 597, the California Supreme Court held that "because a court's imposition of a booking fee is confined to factual determinations, a defendant who fails to challenge the sufficiency of the evidence at the proceeding when the fee is imposed may not raise the challenge on appeal." Defendant seeks to circumvent this holding by raising it as an ineffective assistance of counsel claim. He argues that if trial counsel had objected to the imposition of the fees on the ground of inability to pay, "the court would have lacked the discretion to impose the fees."

The probation report indicates that defendant told the probation officer before sentencing that he did not "have the means to pay for restitution at this time" but if "he

manner specified by the court that a criminal justice administration fee is due the agency: [¶] (1) A judgment of conviction may impose an order for payment of the amount of the criminal justice administration fee by the convicted person . . . . [¶] (2) The court shall, as a condition of probation, order the convicted person, *based on his or her ability to pay*, to reimburse the county for the criminal justice administration fee, including applicable overhead costs." (Italics added.) Government Code section 29550.2, subdivision (a), states: "Any person booked into a county jail pursuant to any arrest by any governmental entity not specified in Section 29550 or 29550.1 is subject to a criminal justice administration fee for administration costs incurred in conjunction with the arresting and booking if the person is convicted of any criminal offense relating to the arrest and booking. . . . *If the person has the ability to pay*, a judgment of conviction shall contain an order for payment of the amount of the criminal justice administration fee by the convicted person, and execution shall be issued on the order in the same manner as a judgment in a civil action, but the order shall not be enforceable by contempt. The court shall, as a condition of probation, order the convicted person to reimburse the county for the criminal justice administration fee." (Italics added.)

19

secures employment while in custody at the CDCR and/or when he becomes financially stable," he "agrees to pay for restitution." According to defendant's statement, eleventh grade was the highest grade he completed and he had "worked odd jobs as a furniture mover, construction worker and various auto mechanic jobs" for the prior nine years. The probation report recommended that the court order defendant to pay victim restitution, including but not limited Patino. The trial court ordered defendant to pay direct victim restitution to multiple victims, including Patino, as well as other fines and fees.

B. *Analysis*

To prevail on an ineffective assistance of counsel claim, a defendant must satisfy *Strickland*'s two-part test by establishing both counsel's deficient performance and prejudice. (*Strickland*, *supra*, 466 U.S. at p. 687.) As to deficient performance, a defendant "must show that counsel's representation fell below an objective standard of reasonableness" measured against "prevailing professional norms." (*Id*. at p. 688.) "Judicial scrutiny of counsel's performance must be highly deferential," a court must evaluate counsel's performance "from counsel's perspective at the time" without "the distorting effects of hindsight," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Id*. at p. 689.)

The prejudice prong requires a defendant to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid*.)

"In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. [Citations.] Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been

20

different.  [Citation.]  This does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.' [Citation.]  The likelihood of a different result must be substantial, not just conceivable. [Citation.]" (*Harrington v. Richter* (2011) 562 U.S. 86, 111-112.)

The United States Supreme Court has advised that "[t]he object of an ineffectiveness claim is not to grade counsel's performance" and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . , that course should be followed." (*Strickland*, *supra*, 466 U.S. at p. 697.)  It is unnecessary to "address both components of the inquiry if the defendant makes an insufficient showing on one." (*Ibid*.)

On the record before us, we cannot conclusively determine that defendant did not have the ability to pay.  If trial counsel had objected, the People may have overcome the objection by producing evidence that defendant did have the ability to pay the booking fees.  This may have been the reason that trial counsel did not object in the first place. "[C]laims of ineffective assistance of counsel generally must be raised in a petition for writ of habeas corpus based on matters outside the record on appeal.  [Citations.]" (*People v. Salcido* (2008) 44 Cal.4th 93, 172.)  On appeal, defendant cannot show the requisite prejudice to establish an ineffective assistance claim because the appellate record does not demonstrate a reasonable probability that the result of the proceeding would have been different had trial counsel objected to the trial court's imposition of booking fees.

## DISPOSITION

The judgments are affirmed.

_____

ELIA, J.


WE CONCUR:



_____

RUSHING, P. J.



_____

PREMO, J.




*The People v. Richardson*

H039069