Filed 12/22/23  P. v. Esparza CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B323807 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA037295) |
| v. | |
| JAVIER ESPARZA, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Lisa Mangay Chung, Judge. Affirmed.

Waldemar D. Halka, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

# I.    INTRODUCTION

In 2011, a jury convicted defendant Javier Esparza of first degree murder and kidnapping.  In 2019, defendant filed a petition for resentencing of his first degree murder conviction pursuant to former Penal Code section 1170.95.[1]  The trial court judge, who had presided over defendant's trial, denied the petition.  Defendant contends the court erred.  We affirm.

# II.    BACKGROUND

## A.    *Defendant's Underlying Convictions*

The following background is taken from the unpublished opinion in the direct appeal from defendant's underlying convictions (*People v. Garcia* (Aug. 17, 2012, B231949) [nonpub. opn.] (*Garcia*))[2]:

---

[1]    All further statutory references are to the Penal Code unless otherwise stated.  Effective June 30, 2022, the Legislature renumbered section 1170.95 to section 1172.6 with no change in text.  (Stats. 2022, ch. 58, § 10.)  Further references will be to the statute's current section number only.

[2]    Neither party presented additional facts at the evidentiary hearing on defendant's section 1172.6 petition and neither party contends the facts as recited in the prior appellate opinion do not accurately reflect the facts in the trial record in this matter.  Accordingly, we set forth the facts from the prior opinion as context for defendant's claims.  In our discussion below, we will address other facts from the record of defendant's underlying convictions as necessary.

"The body of Nicholas Ramirez was found in the trunk of his own car by police on September 18, 2006. The car was located in a desert field. Ramirez had been shot nine times. Ramirez had last been seen by his family on September 16, 2006.

"Some physical evidence connected [defendant, Jaime Garcia, and Claudio Bernardino][3] to the murder of Ramirez, but most of the evidence against them came from the testimony of Matthew Foust.

"Foust testified that on September 16, 2006, about 2:00 a.m., he arrived at . . . Garcia's house in Littlerock, California. Foust had driven from his home in Arizona to purchase a set of car rims from Garcia. When Foust arrived, a party was going on in the garage, but Foust went in the house and slept.

"That morning, about 6:00 or 7:00 a.m., Foust drove Garcia to Garcia's girlfriend's house, where they picked up the rims. When they returned to Garcia's house, Garcia noticed that the tires on his car were slashed and his speakers were missing. Garcia was noticeably upset. [ ] [Defendant], who is Garcia's brother, speculated that it 'could have been them guys from last night.'

"The party the previous night had been a birthday party for Garcia's close friend, Jesse Ramirez. Jesse's brother Nicholas Ramirez, the victim in this case, was at the party. [ ] [Defendant] and Bernardino were also at the party.

"At some point during the party, Jesse got into a fight with [defendant]. Jesse left the party about 7:00 or 8:00 a.m., with

---

3 Garcia and Bernardino were tried with defendant and the jury also convicted them of first degree murder and kidnapping. (*Garcia, supra*, B231949.)

Martin Guzman, who was living with Garcia at the time. According to Jesse, Guzman took a suitcase and clothes that belonged to Garcia, and slashed the tires of Garcia's car. The two men then took a train to Los Angeles.

"After [defendant]'s comment, Garcia went into the house and got his gun. He then told Foust, 'You are going to take us to go find this guy.' Foust was scared and did what he was told. He drove Garcia and [defendant] to Cesar Reyes's house. Reyes was standing outside, waiting for them. Foust then drove to Ramirez's house.

"As Foust and his passengers arrived at the Ramirez house, Nicholas had just finished washing his car and was leaving in that car. According to Ramirez's brother, David, and sister, Yvonne, this occurred around 10:30 a.m. Yvonne saw Foust's car. Ramirez did not stop. Both Garcia and [defendant] told Foust to follow Ramirez.

"Foust followed Ramirez to a gas station and pulled in right behind Ramirez's car. Garcia and Reyes got out of the car, approached Ramirez and, after the three men talked, Ramirez returned to his car accompanied by Garcia and Reyes. Garcia entered the front passenger seat and Reyes returned to Foust's car and told him to follow Ramirez's car.

"Foust followed Ramirez to . . . Bernardino's house. Foust initially told police that the others went inside the house, but he stayed outside and talked with his girlfriend on his phone. He never went inside. At trial, he denied making those statements. He testified that he went inside with the others.

"Inside the house, both Garcia and Reyes asked Ramirez, 'Where is my stuff?' or 'Where is my stereo?' Reyes hit Ramirez in the face, knocking him to the ground. Reyes began kicking

4

Ramirez. Garcia continued to ask, 'Where is my stuff?' Ramirez replied he did not have it and did not know where it was. Bernardino told Garcia to stop because Ramirez was bleeding on his carpet. Bernardino directed [defendant] to take Ramirez to the garage. Reyes forced Ramirez into the garage and everyone followed. Garcia ordered Foust to go to the garage.

"In the garage, Garcia bound and tied Ramirez to a chair. Ramirez continued to deny he had Garcia's stolen items or that he knew where they were. [Defendant] now had Garcia's gun and sat down in front of Ramirez while both Garcia and Reyes threatened to kill him if he did not disclose the location of Garcia's items, as well as Reyes's stereo. Eventually, Ramirez said, 'I want to die. Just take my life.' Garcia then inserted a gag into Ramirez's mouth, Reyes used a pipe to strike Ramirez several times on his head and upper body, and Garcia hit Ramirez several times. For their part, [defendant] and Bernardino kicked Ramirez. At some point, Reyes asked Garcia if Foust was 'cool.' Garcia told Reyes, 'Yeah. It's okay,' which increased Foust's fear.

"Ramirez was walked out of the garage. Garcia ordered him into the trunk of his own car. After Garcia closed the trunk lid, he told [defendant] and Reyes to follow him. [Defendant] and Reyes told Foust, 'We're taking your car to follow' Garcia. [Defendant] sat in the back seat and Reyes sat in the front passenger seat as Foust drove, following Garcia. Having seen what the men had just done to Ramirez and recognizing that Reyes by himself could have beaten him in a fight, Foust was even more afraid.

"After about 5 to 10 minutes of driving, Reyes told Foust to stop the car. When he did so, Reyes got out of the car and ran

away.  [Defendant] ordered Foust to continue following Garcia.  Foust did as he was told.  After Garcia pulled off onto the shoulder near some shrubs, Foust continued on past Ramirez's car for about 100 feet and stopped his car when [defendant] told him to stop.  [Defendant] got out of the car and walked towards Ramirez's car while Foust remained inside his car.  Foust realized he had an opportunity to leave, but he stayed because he was aware that these men knew where his sister lived and that they were perfectly capable of finding him.

"When Foust looked back, he saw Garcia standing over the trunk with the same handgun which he brought with him, the same one [defendant] had been holding in the garage.  Foust looked away.  He then heard at least four to five gunshots.  When Foust looked back, he saw Garcia in the back seat area of Ramirez's car and [defendant] standing near the driver's door.  As Garcia and [defendant] entered Foust's car, they both told Foust 'Go.'

"Garcia gave Foust directions to the house where they had earlier picked up Reyes.  There, all three went into the house.  Garcia and [defendant] changed their clothes and shoes, and Foust drove them back to Garcia's house.  Garcia and [defendant] both told Foust they were going to Arizona with him.  Out of fear, Foust drove Garcia and [defendant] to Arizona.  Garcia and [defendant] stayed with Foust for a day or two before leaving on different buses.  Before Garcia left, he told Foust 'we're going to come and get you' if Foust told anybody what had happened.

"Bernardino fled to Mexico.  He was eventually arrested by the FBI and brought to California.

"On September 18, 2006, the police responded to a call about a suspicious vehicle in a desert field.  The vehicle was

6

Ramirez's car with his body in the trunk. Ramirez was bound at the wrists with cords, and gagged with a cloth and masking tape. There were nine bullet holes in the top of the trunk, and the prosecution expert opined that Ramirez had been shot when the trunk lid was closed. Ramirez had suffered nine gunshot wounds. The bullet pattern on the trunk lid and Ramirez's position inside the trunk were consistent with the shooter firing straight down into the trunk, firing three shots at Ramirez's head and six shots over Ramirez's torso. (*Garcia, supra*, B231949.)

B.     *Defendant's Section 1172.6 Petition*

On June 13, 2019, defendant filed a form section 1172.6 petition for resentencing of his first degree murder conviction. On September 23, 2020, the prosecution filed its response to the petition. On October 15, 2021, the trial court set the matter for an order to show cause hearing. Thereafter, the parties filed briefs for the evidentiary hearing.

On July 6, 2022, the trial court held an evidentiary hearing on defendant's section 1172.6 petition. At the outset of the hearing, the court noted that it presided over the trial of defendant's underlying convictions and had reviewed "the trial notes." Further, the court admitted a compact disc containing the "court transcript of the reporter's transcripts . . . ."

After hearing arguments from the parties, the trial court denied defendant's section 1172.6 petition. The court reviewed the trial evidence and defendant's role in the kidnapping and murder and ruled that defendant's "physical presence and his role afterwards in fleeing, to this court, supports beyond a reasonable doubt his liability, both as an aider and abettor,

specific intent to kill, conspiracy, and then in the felony murder nature that his participation in concert with the defendant's [*sic*] and his own actions constituted a reckless indifference to life."

## III.  DISCUSSION

Defendant contends the trial court erred in denying his section 1172.6 petition because the prosecution failed to prove beyond a reasonable doubt that he was guilty of murder under an aiding and abetting, a conspiracy, or a felony murder theory—i.e., that he was a major participant in the kidnapping and acted with reckless indifference to human life.  We disagree.[4]

A.  *Standard of Review*

"In determining whether a trial court correctly denied a section 1172.6 petition following an evidentiary hearing, ""we review the factual findings for substantial evidence and the application of those facts to the statute de novo."" [Citation.]" (*People v. Arnold* (2023) 93 Cal.App.5th 376, 383.)[5]  "'A

---

[4]  Because we hold that substantial evidence supports the court's aiding and abetting ruling, we need not reach defendant's arguments concerning the court's conspiracy and felony murder rulings, including his argument that the court erred in failing to consider his "youth and maturity level in ruling that his participation in the kidnapping amounted to reckless indifference to human life."

[5]  Defendant acknowledges that "every published appellate court case to date has reviewed a superior court's denial of a section 1172.6 petition following a hearing under subdivision

8

substantial evidence inquiry examines the record in the light most favorable to the judgment and upholds it if the record contains reasonable, credible evidence of solid value upon which a reasonable trier of fact *could* have relied in reaching the conclusion in question.  Once such evidence is found, the substantial evidence test is satisfied.  [Citation.]  Even when there is a significant amount of countervailing evidence, the testimony of a single witness that satisfies the standard is sufficient to uphold the finding.'  [Citations.]" (*People v. Fuiava* (2012) 53 Cal.4th 622, 711.)

B.     *Aiding and Abetting*

"An aider and abettor is someone who, with the necessary mental state, 'by act or advice aids, promotes, encourages or instigates, the commission of the crime.'" (*People v. Smith* (2014) 60 Cal.4th 603, 616; *People v. Sully* (1991) 53 Cal.3d 1195, 1227 ["An aider and abettor is chargeable as a principal, but his liability as such depends on whether he promotes, encourages, or assists the perpetrator and *shares* the perpetrator's criminal purpose"].)  Factors that are relevant to determining whether a

_____

(d)(3) for substantial evidence," but asks us to review the trial court's denial of his petition de novo because (1) section 1172.6 petitions are akin to petitions for writs of habeas corpus and the standard of review for an original proceeding for habeas corpus relief is de novo, and (2) "trial courts do not have an advantage over appellate courts in determining section 1172.6 eligibility based on the record of conviction."  Neither proffered reason persuades us to depart from the substantial evidence standard of review.  (See *People v. Clements* (2022) 75 Cal.App.5th 276, 301 [rejecting de novo review].)

defendant was an aider and abettor include "'presence at the scene . . . , companionship, and conduct before and after the crime, including flight.'" (*People v. Medina* (2009) 46 Cal.4th 913, 924; *People v. Garcia* (2008) 168 Cal.App.4th 261, 273 [aiding and abetting factors "include presence at the scene of the crime, failure to take steps to attempt to prevent the commission of the crime, companionship, flight, and conduct before and after the crime"]; *In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1095 [aiding and abetting factors include presence at the scene of a crime, flight with the perpetrator, and accompanying the perpetrator thereafter].)

Substantial evidence supported the trial court's ruling that defendant aided and abetted Ramirez's murder:

When Garcia discovered that his tires had been slashed and his speakers stolen, defendant suggested that Ramirez might be responsible. Defendant's suggestion caused Garcia to get his gun and to direct Foust to take him and defendant to find Ramirez. On the way to Ramirez's house, they picked up Reyes.

When defendant, Garcia, and Foust arrived at Ramirez's house, Ramirez was leaving in his car. Defendant told Foust to follow Ramirez. They caught up with Ramirez at a gas station and kidnapped him.

Foust and Ramirez drove to Bernardino's house where Garcia and Reyes questioned Ramirez about the location of Garcia's "stuff" and Reyes's stereo. Reyes punched and kicked Ramirez who denied possession of or knowledge about the missing property.

Because Ramirez was bleeding on Bernardino's carpet, he was taken to the garage where Garcia bound and tied him to a chair. Defendant had Garcia's gun and sat down in front of

10

Ramirez while Garcia and Reyes threatened to kill him if he did not disclose the location of Garcia's property and Reyes's stereo.

Eventually, Ramirez said, "I want to die. Just take my life." Garcia gagged Ramirez and Reyes struck Ramirez several times on his head and upper body with a pipe. Defendant kicked Ramirez. Bernardino said, "'Don't blast him here. Take him out to the desert.'"

Garcia and his confederates walked Ramirez out of the garage and Garcia ordered him into the trunk of his own car. Garcia told defendant and Reyes to follow him and defendant told Foust, "We're taking your car to follow" Garcia. After Reyes abandoned the planned murder by exiting Foust's car on the journey to the desert, defendant ordered Foust to continue to follow Garcia.

When Garcia pulled off the road at the site of the murder, Foust continued to drive until defendant told him to stop. Defendant got out of Foust's car and walked towards Ramirez's car. Garcia stood over the trunk of Ramirez's car with the handgun defendant had been holding in the garage. Foust looked away and heard gunshots. Foust looked back and saw defendant standing near the driver's door of Ramirez's car. Garcia and defendant entered Foust's car and told him to drive away.

Foust drove to the house where they had picked up Reyes. After changing their clothes and shoes, Garcia and defendant drove with Foust to Arizona where they remained for a day or two before leaving on different buses.

This evidence showed that defendant knew of the killer's unlawful intent and intended to assist in achieving that unlawful end. (See *People v. Curiel* (2023) 15 Cal.5th 433, 447.) In front of defendant, Garcia and Reyes threatened to kill Ramirez if he did

11

not disclose the location of Garcia's property and Reyes's stereo. Bernardino said that they should not "blast" Ramirez in Bernardino's garage but they should take him out to the desert. That is, that Ramirez should be murdered at a secluded location where the murder would not be detected or tied to Bernardino. Defendant directed Foust to follow Garcia to the planned murder site in the car ultimately used as the getaway car, keeping Foust on course after Reyes got out of car and withdrew from the murder plan and ordering Foust to stop as he continued to drive after Garcia pulled off the road at the murder site. Defendant stood by Ramirez's car as Garcia fired nine shots into the trunk where Ramirez lay. Defendant did nothing to try to stop the murder. After Ramirez's murder, defendant fled with Garcia, first to Reyes's house to change their clothes and then to Arizona where they remained for a day or two.

Accordingly, the trial court did not err by denying defendant's section 1172.6 petition.

# IV.   DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KIM, J.

We concur:

RUBIN, P. J.

MOOR, J.