Filed 11/6/25  P. v. Johnson CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

DELANO JOHNSON,

    Defendant and Appellant.

E084369

(Super.Ct.No. FSB05066)

OPINION

APPEAL from the Superior Court of San Bernardino County.  Cheryl C. Kersey, Judge.  Affirmed.

Thomas Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting, Michael D. Butera and Eric Tran, Deputy Attorneys General, for Plaintiff and Respondent.

1

I.

INTRODUCTION

Defendant and appellant Delano Johnson appeals from the trial court's order denying his Penal Code[1] section 1172.6 petition for resentencing of his two counts of first degree murder (§ 187, subd. (a)) with special circumstances allegations following an evidentiary hearing. On appeal, defendant contends the trial court prejudicially erred in denying his section 1172.6 petition because the court did not act as an independent factfinder and the court did not find that the People had proved beyond a reasonable doubt defendant was guilty of the murders under current law. We conclude defendant fails to demonstrate that the trial court misunderstood its role or applied an incorrect standard of proof. We further conclude that defendant forfeited any claim that the assumed error was prejudicial. Accordingly, we affirm the denial of defendant's resentencing relief.

---

[1] All future statutory references are to the Penal Code unless otherwise stated.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual Background*[2]

The main witness against defendants, Alan ("Cry Baby") Marsh, admitted being a former cocaine dealer, with two prior felony convictions for possession of cocaine for sale.

Marsh testified that on February 4, 1993, between 1:00 and 2:00 p.m., he went to the home of Tony ("Kango") Graves. Graves was in the front yard, along with defendants Delano Johnson and Terry ("Robo") Jordan. Victims Rickey ("Rickey Baby") Wooley and Kenneth Jones came driving up in a blue El Camino. They walked into the yard.

Wooley had a .45 caliber semi-automatic pistol in his left hand. In his right hand, Wooley had a Fila shoe box containing "[l]ots of money," which he showed to everyone in the yard. At one point, Marsh told police there was about $24,000; another time, he told them there was $30,000.

Graves said to Wooley and Jones, "Let's go in the house." Graves, Wooley and Jones went into the house, along with defendant Jordan; Marsh and defendant Johnson stayed out in the yard, drinking beer.

---

[2] The factual background is taken verbatim from this court's unpublished opinion in defendant's direct appeal, case No. E017220, which was attached to defendant's section 1172.6 petition for resentencing. (*People v. Johnson, et al.* (Apr. 22, 1997, E017220) [nonpub. opn.].)

3

Jordan came back out of the house and said to Johnson, "Tony say that we can jack'em." Jordan had a gun in his hand; Johnson also had a gun. Johnson looked at Jordan; they both went back into the house.

About ten minutes later, Marsh went into the house and used the telephone to call his wife. He talked to her for about five minutes. While inside, he heard Wooley ask Graves if he could buy Graves's Monte Carlo. He also saw a stack of money on the kitchen table. Graves was sitting at the table; Wooley was leaning against a kitchen cabinet; Johnson was sitting on the back of a couch by the door; and Jordan was leaning against a wall by the kitchen door. Jordan had his gun in his hand.

Marsh left the house and went across the street, where he played dice with "a couple of other guys." After a while, he heard "a lot" of gunshots. In between shots, he heard Wooley "hollering," two or three times, "Don't hit me no more." Graves's father, who lived next door, came over to the house. Graves ran outside. Graves's father asked where the shots were coming from. Graves said, "[I]t' s the Mexicans in the back shooting." Graves's father asked if he could come in the house to use the phone; Graves said no.

As Graves's father walked away, Marsh saw Johnson and Jordan drag out one body, and then a second body, out of the kitchen door of the house and into the back yard. Johnson went to the front of the house, got into the El Camino, and drove it around to the backyard. Johnson then drove the El Camino out of the backyard, followed by Jordan driving the Monte Carlo.

4

Graves asked Marsh to help him clean up. Marsh looked in through the front door; he saw blood all over the kitchen floor, and blood spots on the carpet. He did not help clean up; instead, he went back across the street. From there, he saw Graves, with a hose, watering down the side of the house.

Six or seven minutes later, Johnson and Jordan returned. They were both in the Monte Carlo. Graves told Marsh not to say anything about what had happened. He added that Marsh should "get broke off," i.e., paid for his silence. Graves, Johnson and Jordan got into a Lincoln, which Graves got from his father's house, and left. Marsh testified that at this point, it was still light out. Thirty or forty-five minutes later, they returned, still in the Lincoln; Johnson and Jordan had changed clothes. Marsh stood in the front yard with them. Graves said "[h]e felt bad that Terry [Jordan] had shot Rick Wooley . . . he didn't know that Terry [Jordan] was going to get him."

At about 11:20 p.m., the El Camino was found, on fire, in the backyard of a vacant house. This was about one mile, or a four-minute drive, from Graves's house. After firefighters put out the fire, they found the burnt bodies of Wooley and Jones in the bed of the El Camino. Nearby, there was a plastic bottle which smelled of gasoline.

The El Camino was not tested for fingerprints; it would have been impossible to recover fingerprints from a vehicle which had been burned and then hosed down. An autopsy revealed that Wooley had been shot five times, and Jones three times. Gunshot wounds were the cause of death in both cases.

5

One bullet, plus some bullet fragments and casings, were recovered from the bed of the El Camino. The bullet was .45 caliber; the victims had been shot with either .38 caliber or 9 millimeter bullets. Detective Jon Waterhouse testified that the bullet from the El Camino had no rifling. He concluded that it had "cooked off," i.e., gone off due to the heat of the fire.

On March 1, 1993, Graves paid $7,200 in cash for a red 1990 Mustang convertible.

On August 18, 1993, Detective Waterhouse, acting on a tip, interviewed Marsh. Marsh was in jail on a drug-related charge. According to Detective Waterhouse, Marsh asked him to arrange for him to be sentenced in certain unrelated matters concurrently rather than consecutively. Detective Waterhouse also testified that Marsh initially told him a story that was very different from his testimony at trial. At the end of the interview, Detective Waterhouse showed Marsh photos of Wooley and Jones when they were alive, plus photos of their burned bodies. Marsh was visibly shaken; at that point, he agreed to tell Detective Waterhouse about the murders.

Detective Waterhouse interviewed Marsh two or three more times; during these interviews, Marsh's account of the murders again differed in various particulars from the testimony he ultimately gave at trial. However at least after he was shown the photographs of Wooley and Jones—Marsh's story remained consistent with respect to who was in the house, hearing shots, hearing Wooley say, "Don't hit me no more," seeing defendants remove the bodies from the house, and seeing defendants drive the El Camino

6

away. Detective Waterhouse also testified that Marsh lied at the preliminary hearing, by denying that he had asked Detective Waterhouse to arrange for concurrent sentencing, and by denying that he had given conflicting accounts.

Marsh denied having lied in this case "[a]t any time, at any place, anywhere." At first, Marsh denied he asked Detective Waterhouse to arrange concurrent sentencing for him, or for any other help; ultimately, however, he admitted asking him "whether my sentence could be concurrent."

On August 20, 1993, Sheriff's Deputy Katherine Cardwell interviewed Marsh. He claimed he had told Eric ("Big E") Wilson and Anthony ("Speedy") Perkins, the vice-president and president of his motorcycle club, about the murders. He also claimed Maria Morris had warned him that, as a result of a murder which had occurred on February 4, 1993, Johnson, Jordan and Graves were going to kill him. Maria Manis, Eric Wilson, and Anthony Perkins all denied that Marsh ever told them about the murders. Manis also denied ever telling Marsh someone was after him.

On August 31, 1993, police served a search warrant at Graves's house. On the carpet just outside the kitchen and on the padding underneath, they found blood stains. The stains were diluted at the top of the padding, but more concentrated toward the bottom, indicating someone had tried to clean them. Testing revealed that the blood could not have come from Graves or Wooley. In fact, it could not have come from a Caucasian, and it could have come from only 1 in 478 Hispanics, and 1 in 82 African

7

Americans. Jones was in the 1-in-82 group. Thus, the blood could have come from Jones.

Under the padding, police also found a single expended bullet. A criminalist compared it to the bullet recovered from Jones's body and concluded that both bullets were "probably" fired from the same gun.

When Marsh was at court to testify at the preliminary hearing, Johnson said to him, "I hope you're not going out like that. If you is, it won't be too long that you're going to die." Once, somebody shot at Marsh but missed.

Cardel Johnson, the brother of victim Wooley, testified that the last time he saw Wooley alive was on February 4, between 1:00 and 2:00 p.m. However, he also told police the last time he saw him was at 5:00 p.m. on February 3. Later, he told police he last saw Wooley at 10:30 p.m. on February 4; he added that he saw Jones at 7:30 p.m. on February 4.

Drucilla Wooley Malloy, victim Wooley's mother, testified that Wooley lived with her. On February 4, when she left the house at 10:30 a.m., he was home. She returned at 2:30 or 2:45 p.m. and remained home until 6:20 p.m.; he was not there at all during this time. She returned home again a little after 10:00 p.m.; he still was not there. She also testified that Wooley kept a Fila shoe box in his room.

Maria Zetina, who lived near where the bodies were found, testified that one evening in February, between 11:15 and 11:20 p.m., she heard three gunshots; 15 or 20 minutes later, she heard either a fourth, louder gunshot or an explosion. A couple of

minutes later, firefighters arrived. She could see that something behind a nearby house was burning.

Juanita Crum, who also lived near where the bodies were found, testified that at 10:00 p.m. on February 4, she saw a blue El Camino drive by and go behind a vacant house. Five or ten minutes later, a big car, "like a Lincoln" drove up and parked. The driver remained in the car.

After Crum went to bed, she heard two gunshots, and moments later, two explosions. She looked outside and saw flames. She heard "shells being shot off." Firetrucks arrived immediately thereafter. The car that had been parked was gone.

Ronald Smith, who lived across the street from Graves's house, testified that on February 4, he was home "pretty much" the entire afternoon, and he did not hear any gunshots.

B. *Procedural History*

In 1995, a jury convicted defendant of two counts of first degree murder (§ 187, subd. (a); counts 1 and 2) and one count of second degree robbery (§ 211; count 3). The jury also found true that defendant personally used a firearm in the commission of the offenses (§ 12022.5, subd. (a)) and that a principal was armed with a firearm (§ 12022, subd. (a)(1)) in the commission of all three counts. The jury also found true the special circumstance allegations of multiple murders (§ 190.2, subd. (a)(3)) and that the murders were committed during a robbery (§ 190.2, subd. (a)(17)(A). The trial court sentenced

9

defendant to an indeterminate term of life without the possibility of parole, plus a determinate term of four years.

On January 10, 2023, defendant filed a petition for resentencing pursuant to section 1172.6. The People filed an opposition to defendant's petition on June 9, 2023. The court appointed counsel for defendant on July 21, 2023.

On January 3, 2024, the trial court found a prima facie showing had been made and issued an order to show cause.

The evidentiary hearing was held on April 12, 2024. Neither defendant nor the People offered new evidence and only presented argument. Both parties requested that the trial court take judicial notice of "the entire court file with respect to this case" including the appellate records.

In support of defendant's petition, his counsel highlighted the burden of proof required of the prosecution at the evidentiary hearing under section 1172.6 and then reaffirmed the prosecution's burden multiple times thereafter. Throughout his argument, defense counsel made clear that the prosecution bore the burden of establishing, beyond a reasonable doubt, that defendant was guilty of murder under a legally valid theory. Defense counsel noted three potential avenues for which the prosecution could potentially meet his burden: that there was the existence of "evidence beyond a reasonable doubt that suggests" defendant was an aider and abettor to the murder; that he was somehow the direct perpetrator; or that he fell within the category of being a major participant who acted with reckless indifference to human life. Defense counsel then

10

argued that the only witness that placed defendant at the scene and a gun in his hand was Alan Marsh and that there was insufficient evidence beyond a reasonable doubt defendant either directly aided and abetted the murders or that he was a direct perpetrator. Counsel noted that Marsh was not credible because his trial testimony was discredited and inconsistent in numerous ways, as shown through cross-examination and other witnesses. Defense counsel also pointed out that even if the trial court believed Marsh, the state of the evidence failed to show what happened inside the home or "who shot who."

Defense counsel then went through the *Banks*[3] and *Clark*[4] factors in arguing that defendant was not a major participant acting with reckless indifference in the robbery. Counsel suggested that there was no evidence defendant planned the crime, played any role in supplying or using the weapons, or understood the particular dangers posed by the nature of the crime or the violent propensity of his cohort. Counsel further noted that the evidence was unclear whether defendant was at the scene of the murder or whether he was in a position to facilitate or prevent the actual murder. Defense counsel claimed the trial court would "struggle to come to the conclusion beyond a reasonable doubt" that defendant was a major participant who acted with reckless indifference. Counsel highlighted that the trial court had the ability to reexamine the evidence and hold the prosecution to its burden of proving a viable theory that defendant was guilty of the murders beyond a reasonable doubt. In conclusion, defense counsel reemphasized that

---

[3] *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*).

[4] *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).

11

there was "no viable theory in existence to allow the People to conclude beyond a reasonable doubt that" defendant was guilty of murder.

The prosecutor responded by noting defendant's own petition contradicted defense counsel's arguments. Although defense counsel argued that Marsh was the only witness that placed defendant at the scene of the murder and with a gun in his hand, the People explained that defendant's section 1172.6 petition conceded that defendant had stipulated to the fact he was armed the day of the murders and that it was uncontested defendant assisted the killer, or killers, in removing the victims' bodies from the residence in which they were killed. The prosecutor then addressed the *Banks* and *Clark* factors. The prosecutor noted defendant's participation in removing the victims' bodies, his role in waiting outside the home with a gun at the ready, his role in waiting for Jordan to confirm the robbery would proceed, his awareness that Jordan had a gun in his hand prior to the robbery and the dangers posed therefrom, his presence in the room while the victims were killed and for an extended period of time, his flight from the scene after the murders, and his failure to minimize the possibility of violence during the robbery. Based on the totality of the circumstances, the prosecutor argued that the trial court could easily find the likelihood of firearms being used to rob the victims was extremely high, which indicated a reckless indifference to human life, and which was sufficient to convict defendant of murder as required by section 1172.6. After hearing argument, the trial court stated it needed time to review the record and took the matter under submission.

On June 7, 2024, after explaining it had reviewed all of the documents in the case, the trial records, and in particular, the testimony of Marsh, the trial court denied defendant's section 1172.6 petition.  As to Marsh's testimony, the court stated: "[H]e was a critical witness in the trial.  All three defense attorneys outlined and argued and bickered over his credibility, statements that he made to Detective Waterhouse and others, along with his criminal history.  So his credibility was definitely at issue and placed at issue before the jury.  So that was well brought before the jury to make a decision as to whether or not they believed Mr. Marsh's testimony.  [¶]  I know, [defense counsel], the bulk of your argument was that Mr. Marsh, as defense counsel prior to you, couldn't be trusted for his statements.  But the Court noticed that his testimony and credibility were weighed by the jury.  And in his direct and cross examination, the Court didn't find really any reason to disbelieve his statement of facts in his testimony.  I know he had prior inconsistent facts, but very little of that was brought out in the trial before the jury."

The court noted that at the evidentiary hearing, the parties argued the factors set forth in *Banks* and *Clark*, and that the court reviewed these factors.  Thereafter, the court stated it was denying the petition for the following reasons: "The Court finds that the defendant could be found guilty of murder under any of the three possible theories, either aiding and abetting, a robbery and murder, as multiple victims, two people were killed, and multiple shots were fired.  The defendant could have been found by the jury and could—as a perpetrator of the crime by his presence at the scene.  The discussion regarding the robbery and use of a firearm, which he's—he admitted in his petition, and it

13

really wasn't in dispute. And, also, he could be found guilty as a major participant with reckless indifference to human life. [¶] Although, [defense counsel], your argument was persuasive, the problem always goes back to the facts of the case. What your argument is, is that your client is okay with the robbery, and he admits to that. He's okay with using a gun and going inside the house, and he's okay with the theft of the money that was in the shoe box, and he's good with the body disposal, theft of the vehicle, and burning the bodies later that evening. But he's claiming that he's not an actual shooter when he admittedly, and other witnesses, have him and the co-defendant Jordan entering the house with handguns. Initially, victim Wooley had a handgun. That was in the testimony. So several guns were in the house and multiple shots, that was consistent in the testimony, were fired inside the house. So your client, I don't think that he can now argue that he wasn't a major participant in the murder. [¶] So you have different ballistics, different ammunition found, not only in the house, but in the bodies, and then a different kind, sounded like from the testimony, that was unidentified in the vehicle. So your argument that your client somehow went in the house with a gun to do a robbery, didn't fire that gun, is not credible to the Court. And the Court can infer, I think as well the jury did, that he was a major participant and perpetrator by their finding of not only first-degree murder, but also the firearm use to be true. [¶] So in examining your arguments that you made during the hearing, both of you said that the defendant was— played a role in the planning. He agreed in front of others to do the robbery. He went inside when asked by Tony, Mr. Graves, and he had permission to enter the house. The

14

weapons were supplied, and he had a weapon when he arrived at the house. [¶] The participants acted in concert by going into the house after Mr. Wooley to get his money that he had previously shown to all of the participants. He had knowledge of the money. He had permission to commit the robbery, he had a gun and shots were fired. So he was present at the scene and also assisted in the cleanup. [¶] So the argument that he didn't have anything to do with the actual murder is not a credible argument once you look at all the different factors under *Clark* and *Banks*. So the Court denies your request for resentencing for those reasons."

Defendant timely appealed.

## III.

## DISCUSSION

Defendant contends the trial court applied the wrong standard of proof in denying his section 1172.6 petition. In defendant's view, the court did not act as an independent factfinder to determine whether the People had proven beyond a reasonable doubt that defendant could be convicted of murder under current law, but rather, applied a more lenient substantial evidence test in deference to the jury's findings. As we shall explain, we are satisfied that the court understood and fulfilled its role as an independent factfinder and applied the correct standard of proof. We further conclude that any assumed error was harmless.

A. *Governing Law*

Prior to the effective date of Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Stats. 2018, ch. 1015), malice could be imputed to a person who did not personally harbor it who under two theories:  (1) the felony-murder rule, and (2) the natural and probable consequences doctrine.  Under the felony-murder rule, a defendant could be liable for first or second degree murder if the defendant or an accomplice killed someone during the commission or attempted commission of an inherently dangerous felony. (*People v. Powell* (2018) 5 Cal.5th 921, 942.)  Under the natural and probable consequences doctrine, an aider and abettor could be found "guilty not only of the intended, or target, crime but also of any other crime a principal in the target crime actually commits (the nontarget crime) that is a natural and probable consequence of the target crime."  (*People v. Smith* (2014) 60 Cal.4th 603, 611.)

Senate Bill No. 1437 amended the statutes defining malice (§ 188) and felony murder (§ 189, subd. (e)) to "eliminate[ ] natural and probable consequences liability for murder as it applies to aiding and abetting, and limit[ ] the scope of the felony-murder rule."  (*People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*).)  It also added former section 1170.95, "which creates a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief."  (*Lewis*, at p. 957.) Effective January 1, 2022, Senate Bill No. 775 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 551, § 2) amended section 1170.95 to extend the resentencing procedures to a person convicted under any "other theory under which malice is imputed to a person based

16

solely on that person's participation in a crime."  Former section 1170.95 has since been renumbered as section 1172.6, with no substantive changes.  (Stats. 2022, ch. 58, § 10.)

If a section 1172.6 petition contains all required information (e.g., declaration of eligibility, case information, any request for appointed counsel), the trial court "must 'review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of [section 1172.6].' [Citation.]  If the petitioner has made this initial prima facie showing, he or she is entitled to appointed counsel, if requested, and the prosecutor must file a response, and the petitioner may file a reply. [Citation.]  The court then reviews the petition a second time.  If it concludes in light of this briefing that the petitioner has made a prima facie showing of entitlement to relief, it must issue an order to show cause and hold an evidentiary hearing to determine whether to vacate the murder conviction and recall the sentence and resentence the petitioner on any remaining counts."  (*People v. Roldan* (2020) 56 Cal.App.5th 997, 1003.)  The prosecutor and the petitioner may offer "new or additional" evidence at the evidentiary hearing.  (§ 1172.6, subd. (d)(3).)

B.  *Standard of Proof*

We begin with the general principle that "[a]bsent evidence to the contrary, we presume that the trial court knew and applied the governing law."  (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1390.)  Here, the governing statute explicitly provides that on a petition for resentencing, the prosecution must "prove, beyond a reasonable doubt, that the petitioner is guilty of murder" under current law.  (§ 1172.6, subd. (d)(3).)  The statute

17

also makes clear that "[a] finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (*Ibid*.)

Nothing in the record affirmatively suggests the trial court misapplied the standard of proof or mistook its role in the manner urged by defendant. In the briefing and arguments below, defendant's counsel repeatedly argued that the trial court's role was to determine whether defendant could be guilty of murder beyond a reasonable doubt under existing law. The prosecutor did not argue to the contrary, and neither side suggested that the court was tasked with simply determining whether substantial evidence supported the jury's findings. Although the court did not explicitly state the prosecution had proven beyond a reasonable doubt that defendant could be convicted of murder under a currently valid theory, section 1172.6 did not require the court to make express findings or state the standard it employed.

Defendant nevertheless insists that various remarks by the trial court revealed its confusion over its role and the appropriate standard of proof. For instance, defendant cites the court's statement that Marsh's " 'credibility was definitely at issue and placed at issue before the jury' "; that it " 'was well brought before the jury to make a decision as to whether or not they believed Mr. Marsh's testimony' "; and that "the court relied heavily on inferences drawn by the jury rather than making independent findings." Defendant also highlights the court's remarks that defendant " '*could* be found guilty of murder under any of the three possible theories' and that he '*could* have been found by

18

the jury' to be a perpetrator." Defendant further insists that "the court appeared to shift the burden of proof" to defendant when it stated " 'your client, I don't think that he can now argue that he wasn't a major participant in the murder' and that [defendant]'s argument about not firing his gun was 'not credible.' " We are not convinced that these statements, when read in context, demonstrate the court's error.

The record clearly shows the trial court reviewed the case itself very carefully to reach its own inferences and conclusions. Immediately following the arguments presented by both parties, the trial court indicated it needed to take the matter under submission to allow it to independently review the record, including the case's transcripts and Marsh's testimony, before rendering any decision. After about two months, the parties reconvened and the court noted that it had reviewed all of the documents associated with the case and, "as promised," specifically read Marsh's trial testimony because he was a critical witness. After confirming it had independently reviewed the record, the trial court proceed with providing its reasoning for denying defendant's petition.

The trial court explained that the primary issue raised by defendant was Marsh's credibility and it "didn't find really any reason to disbelieve his statement of facts in his testimony." The court observed that Marsh's testimony contained inconsistent facts, but "very little of that was brought out" at trial. The court again informed the parties that it had reviewed the matter "quite carefully" and concluded that it would deny defendant's petition because it found that defendant could be guilty of murder under any of the case's

19

three possible theories of murder. The trial court then specifically addressed various factual bases from the record for why it believed defendant could be found guilty of murder under theories of aiding and abetting, direct perpetrator, or as a major participant with reckless indifference to human life.

Specifically, the court stated, "So your argument that your client somehow went in the house with a gun to do a robbery, didn't fire that gun, *is not credible to the Court*. And *the Court can infer*, I think as well the jury did, that he was a major participant and perpetrator by their finding of not only first-degree murder, but also the firearm use to be true. [¶] So in examining your arguments that you made during the hearing, both of you said that the defendant was—played a role in the planning. He agreed in front of others to do the robbery. He went inside when asked by Tony, Mr. Graves, and he had permission to enter the house. The weapons were supplied, and he had a weapon when he arrived at the house. [¶] The participants acted in concert by going into the house after Mr. Wooley to get his money that he had previously shown to all of the participants. He had knowledge of the money. He had permission to commit the robbery, he had a gun and shots were fired. So he was present at the scene and also assisted in the cleanup. [¶] So the argument that he didn't have anything to do with the actual murder is not a credible argument once you look at all the different factors under *Clark* and *Banks*." Although defendant emphasizes the court's statements to the credibility findings made by the jury, the trial court's remarks do not demonstrate the court's failure to act as an independent factfinder on matters material to resentencing of the first degree murder

20

charges. The court's acknowledgment that its inferences and conclusions could also mirror those reached by the jury does not equate to any improper deference to the jury's determinations.

As for the trial court's remarks that defendant "could" be found guilty of murder under theories of aiding and abetting, direct perpetrator, or as a major participant with reckless indifference to human life, we acknowledge the statements on its face could be viewed as applying a deferential standard of review. However, when read in context, it reasonably appears the court was emphasizing the strength of the incriminating evidence that supported defendant's role in the robbery, and thus, his culpability for murder under current law. Nothing that the trial court stated at the hearing showed that it was unaware of the correct standard of review, nor did the court ever state that it was applying any standard other than that of beyond a reasonable doubt. Rather, the court demonstrated its recognition that it was tasked with determining whether defendant remained guilty of murder beyond a reasonable doubt under a currently correct legal theory. Indeed, defendant's counsel repeatedly and clearly stated the correct standard of review during his argument at the evidentiary hearing. Moreover, defendant's counsel repeatedly emphasized the People's burden at the evidentiary hearing by reminding the trial court that it's role was to determine whether defendant remained guilty of murder beyond a reasonable doubt under a correct theory of liability. When responding to the arguments raised by defendant's counsel, the prosecutor never contested or rejected this burden.

Instead, the prosecutor further acknowledged that the trial court needed to determine defendant's guilt pursuant to the requirements of section 1172.6.

The record does not support the conclusion that the trial court did not understand or apply the correct legal standard or shift the burden of proof at the evidentiary hearing. At most, the trial court's imprecise language that it "could" find defendant guilty on multiple theories of murder and rejection of defendant's arguments merely reflected shorthand for its conclusion that the People met its burden in establishing defendant was guilty of murder as an aider and abettor, a direct perpetrator, or a major participant with reckless indifference to human life.

In sum, we are satisfied that the trial court properly understood and performed its role of independently considering and weighing the evidence to determine that defendant could, beyond a reasonable doubt, be convicted of murder under current law. (§ 1172.6, subd. (d)(3).)

C. *Prejudice*

Even assuming for the sake of argument that the trial court applied an incorrect standard of proof at the evidentiary hearing, we conclude the purported error was harmless.

In *People v. Vance* (2023) 94 Cal.App.5th 706 (*Vance*), we held that a trial court's application of the incorrect burden at an evidentiary hearing under section 1172.6 was not structural error. (*Vance*, at pp. 715-716.) We further held that the harmless error test articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) applied. As we

22

explained, because a petition under section 1172.6 is not a criminal prosecution, most of the federal protections that attend a criminal conviction (e.g., right against double jeopardy, right against self-incrimination, right to trial by jury) do not apply. (*Vance*, at p. 716; see *People v. Garrison* (2021) 73 Cal.App.5th 735, 746-747.) And because the requirement of proof beyond a reasonable doubt in resentencing proceedings under section 1172.6 is merely a statutory right provided by the Legislature, "a violation of the right is subject to the state law harmless error standard." (*Vance*, at pp. 716-717; accord, *People v. Rodriguez* (2024) 103 Cal.App.5th 451, 459 ["Even if the trial court erred in describing its role or applying the burden of proof, the error was harmless because it is not reasonably probable that absent the error appellant would have achieved a more favorable result."].) The error is harmless unless there is a reasonable probability that the trial court would have granted defendant's resentencing petition had it properly applied the reasonable doubt standard. (*Vance*, at p. 716; *Watson*, at p. 837 [error harmless unless there is a reasonable probability of a more favorable outcome absent the error].)

Even assuming arguendo that the trial court applied the wrong standard, any error was harmless because there is no reasonable probability that the trial court would have granted defendant's resentencing petition had it applied the beyond the reasonable doubt standard. Under the revised version of section 189, a defendant can still be convicted of felony murder if he was "the actual killer," or "with intent to kill, aided, abetted . . . the actual killer," or he "was a major participant in the underlying felony and acted with reckless indifference to human life." (§ 189, subds. (e)(1)-(3).)

23

Here, the evidence in the record supports defendant's guilt beyond a reasonable doubt under all three theories of murder, as the trial court correctly determined at the evidentiary hearing. There was strong evidence beyond a reasonable doubt that both defendant and Jordan shot the victims. Marsh testified that Jordan confirmed with defendant that they obtained permission to rob and kill, the victims for the cash. Both defendant and Jordan had armed themselves with guns and then entered the home before multiple gunshots were heard. Two different types of bullets were recovered from the victims' bodies and inside the home. The evidence indicated that only one other party possessed a firearm, but that firearm belonged to one of the victims and was ruled out as a murder weapon. Both victims suffered multiple gunshot wounds and died therefrom. From the two types of bullets found in the victim's bodies, and from the fact that defendant and Jordan had the two guns that could have fired those bullets, the evidence strongly supports that both defendant and Jordan shot the victims. Though it could not be determined whose bullet caused the victims' death, the law provides that when multiple shooters concurrently engage in gunfire and a victim is killed by a single bullet, each shooter may be liable for murder even though the evidence does not establish who fired the fatal shot. (*People v. Bland* (2002) 28 Cal.4th 313, 337; *People v. Sanchez* (2001) 26 Cal.4th 834, 845; *People v. Lopez* (2021) 73 Cal.App.5th 327, 333.) Senate Bill No. 1437 did not impact this theory of substantial concurrent causation. (*People v. Carney* (2023) 14 Cal.5th 1130, 1145-1147.)

Furthermore, defendant's actions immediately following the shooting also support defendant's involvement with the robbery and murder. Defendant dragged the victims' bodies out of the home, stole one of the victim's vehicles, loaded the victims' bodies into the vehicle, drove away from the scene of the murder, and lit the vehicle and victims' bodies on fire. Based on the record here, the evidence strongly indicates that defendant was either a direct perpetrator, or aided and abetted his cohort, in the robbery and murder. Nonetheless, at the very least, the evidence supports beyond a reasonable doubt that defendant was a major participant who acted with reckless indifference to human life to the robbery and murder.

Because there was strong evidence supporting a finding beyond a reasonable doubt that defendant either expressly intended to kill the victims, or that he deliberately and with conscious disregard for human life performed an act that was dangerous to human life—and because the evidence fails to support a contrary finding—we see no reasonable probability that defendant would have obtained a more favorable result absent any assumed error by the trial court.

IV.

DISPOSITION

The order denying the petition for resentencing is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON_____

J.

We concur:


RAMIREZ_____

P. J.


FIELDS_____

J.